UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF NEW YORK

- -------------------------------------------------------- X

MASAHIDE KANAYAMA,

     Petitioner,

        v

SCOTT KOWAL, Chief of U.S. Pre-
Trial Services SDNY, and DOES 1-10,

     Respondents.

- -------------------------------------------------------X

Case No.:  1:23-CV-3469

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

LAW OFFICES OF DAVID M. DUDLEY
3415 South Sepulveda Boulevard,
Suite 1100
 Los Angeles, CA 90034
Ph: (310) 772-8400
Fax:  (310) 772-8404
*Attorney for Petitioner*
*Masahide Kanayama*

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241

## INTRODUCTION

1. Petitioner Masahide Kanayama is a medical doctor who resides in New York City as a permanent United States resident.  He is a Japanese citizen who has applied for American citizenship.

2. Dr. Kanayama is a renowned gynecological surgeon who has developed an innovative and immensely successful surgical technique for treating endometriosis, making him one of the pre-eminent surgeons of his kind not only in this country, but in the world. Exhibit 1.

3. The petitioner has no criminal history whatsoever in any nation.

4. The Japanese government is seeking the extradition of the petitioner from the United States as part of an investigation concerning two alleged instances of vandalism which would almost certainly be charged as misdemeanors anywhere in this country, including Manhattan—if they were charged at all.

5. If returned to Japan, Dr. Kanayama would face persecution as a Christian missionary, which he has been for many years, in a largely Buddhist and Shinto nation that has a history of persecuting those of Christian belief. Ex. 1.

6. Recently, a judge in the Southern District of New York granted the United States government's request for certification of the petitioner's extradition.

7. As there is no statutory mechanism for appealing the district court's certification order, the only process available to Dr. Kanayama for review of that order is the filing of this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. section 2241.

## PROCEDURAL HISTORY

8. On April 4, 2015, the police force in Narita, Japan obtained an arrest sheet or warrant for Dr. Kanayama as part of its investigation into two purported events of vandalism—one at a Buddhist temple in the city of Narita, the other at a Shinto shrine in the area of Katori—on the same date in March of that year. The execution of that sheet or warrant would, under Japanese penal law, allow the Narita police to detain the petitioner for interrogation over a 23-day period, which can be extended for a much longer time period.

9. These arrest sheets have been updated in Japan numerous times since the spring of 2015.

10. On December 12, 2016, the Japanese government sent the United States State Department a Diplomatic Note requesting the extradition of Masahide Kanayama. The State Department later referred the matter to the Department of Justice.

11. On May 30, 2017, the DOJ, through the United States Attorney in the Southern District of New York, filed an extradition complaint against Dr.

Kanayama.  The case number given to that action in the Southern District was 17-Misc.-1.

12. On June 2, 2017, the United States Marshal's Service arrested the petitioner in New York City.

13. Several days later, a federal magistrate judge ordered the petitioner's release from custody on certain conditions, pending the resolution of the extradition complaint.

14. On August 22, 2017, the government filed its memorandum in support to the extradition request.

15. On October 20, 2017, Dr. Kanayama filed his formal opposition to that request.

16. On November 17, 2017, the government filed its reply to that opposition.

17. On January 12, 2018, the petitioner filed a sur-reply to the government's response.

18. On December 6, 2022, the district court, Judge Ramos presiding, held a formal extradition hearing.

19. On January 26, 2023, the district court issued a written order certifying the petitioner for extradition.

20. Dr. Kanayama now files this Petition, naming Scott Kowal,  Chief of Pre-Trial Services for the Southern District of New York as the respondent.  The

naming of this respondent is based upon research conduced by the petitioner, but the available authority on the issue of who should be the proper respondent in this matter is extremely limited. Therefore, the petitioner has reserved the right to name other possible appropriate respondents by including several DOES in the title of the Petition.

## STATUS OF PETITIONER

21. The petitioner remains on supervised release conditions, modified since his initial release on bond. He is not permitted to travel internationally and his passport is in the hands of the United States Pre-Trial Office for the Southern District of New York.

22. He can travel within the fifty states, but he must receive permission from his pre-trial officer.

23. He must report to that officer telephonically or in person as directed.

24. He has posted a secured bond, which includes $1,000,0000 cash and two properties he owns in Manhattan, with the district court.

## BRIEF SUMMARY OF FACTUAL ALLEGATIONS

25. On March 25, 2015, a man allegedly touched certain pillars at the Narita-san Shinjoji Temple, a Buddhist facility and major tourist attraction in Narita, with a small amount of vegetable-based oil on his fingertip. Later that same day, a man allegedly touched some pillars, stairs, and an offering box at the

Katori Jingu Shrine, a Shinto facility and tourist attraction, with a small amount of vegetable-based oil on his fingertip.  That man also made a motion with his hand that seemed to be consistent with drizzling some object with a liquid.

26.   Based upon a grainy black-and-white video which they never presented to American governmental authorities, the Narita police concluded that the perpetrator of both events was the same man.

27.   For reasons discussed below, the police concluded that this man was Dr. Kanayama.

28.  Even though the directors of both the Temple and the Shrine had already determined that no repairs were needed to the affected areas at their respective institutions, the police instructed them to get repair estimates for the supposed damages to their structures.  The total monetary amount of those two repair estimates was slightly over 20,000 USD.

29.   Because the alleged stains on the wooden objects at those structures never resulted in any loss of function or use—or any significant defacement—and because those stains were temporary and dissipated naturally, no repairs at all were ever undertaken at either location.

## APPLICABLE LAW

30.   The parties to this case agree that, in order to lawfully certify an extradition request in this matter, the district court must determine three questions.  First, whether a valid extradition treaty exists between Japan and the United States. Second, whether the events underlying the Japanese extradition request meet the requirement of dual criminality—the requirement that the facts alleged by the Narita police would, if proved, represent a felony offense both under Japanese penal law and an applicable criminal statute in America.  Third, there must be probable cause, as determined by an American court, to find that such a felony offense had been committed and that the extradition defendant was the culprit.

31.   There has been no dispute that a valid extradition treaty exists between the United States and Japan.

32.   The parties have disagreed as to whether the government has met the dual criminality and probable cause requirements to support certification of extradition.

## THE DISTRICT COURT ORDER

33.   In a brief written opinion, the district court certified the government's extradition request.  That opinion is attached to this Petition as Exhibit 14.

34.   In its order, the court concluded that the government had met both the requirements of dual criminality and probable cause.

## THE DISTRICT COURT ERRONEOUSLY FOUND THAT THE GOVERNMENT HAD DEMONSTRATED DUAL CRIMINALITY

35.   Under the doctrine of dual criminality as applied to the Japanese-American extradition treaty, the government must prove that the facts alleged by Japan, the requesting country, would represent a criminal offense—and that such an offense would be a felony in both nations.

36.   Here, the Japanese government claimed that the petitioner's alleged conduct violated Article 260 of the Japanese penal code, a vandalism statute . In its moving papers before the district court, the United States government asked the court to compare Article 260 with New York Statute Articles 145.05 and 145.10, criminal mischief statutes prohibiting certain types of vandalism.

37.   Nevertheless, the conduct attributed to Dr. Kanayama would not represent a criminal offense under those New York statutes for two reasons.

38.   First, the New York statutes require a specific intent to damage the property at issue.  By contrast, Japanese Article 260 mentions no element of intent in its provisions at all.  Therefore, the mens rea applicable to that article is the intent defined by Article 38 of the Japanese penal code, which is one of general intent.  Consequently, as the documents submitted by Japan allege that

Dr. Kanayama applied oil to the objects in question for religious purposes and offer no other narrative of his intent, his supposed actions would not have been a criminal offense of any kind in New York.

39.   Second, the New York statute mandates that the property at issue must suffer actual damage.  And there is a line of New York state cases which conclude that defacement to a property that is only temporary does not represent such actual damage.  Moreover, the New York definition of actual damages focuses on factors such as loss of function or use and, as the Japanese authorities have admitted, no such loss occurred at either the Narita temple or the Katori shrine.

40.   Even if the conduct attributed to the petitioner would somehow represent a crime of some sort in New York, it certainly would not fall into the category of a felony.

41.   Under NYS 145.10, criminal mischief does not rise to the level of a felony unless the actual damages incurred by the victim property exceed $1,500.

42.   In this case, though the Narita Temple and Katori Shrine did obtain repair estimates—as directed by law-enforcement authorities—neither facility actually undertook such repairs, as they were completely unnecessary.  And, as confirmed by the Japanese government, neither place suffered any loss of use or income from the alleged temporary damage.

43.   Therefore, the total monetary damage to the Temple and the Shrine was zero USD.   As a result, if the petitioner's purported behavior did violate the provisions of NYS 145.10, it would not be a felony violation.

44.   Hence, the district court mistakenly concluded that the government had satisfied the requirements of dual criminality under the applicable extradition treaty.

## THE DISTRICT COURT ERRONEOUSLY FOUND THAT PROBABLE CAUSE EXISTED TO SUPPORT THE EXTRADITION OF THE PETITIONER

45.   Even if the government had met the mandate of double criminality, it did not demonstrate that probable cause existed to prove that the American dual crime of criminal mischief had been committed—and that the petitioner had been the perpetrator of that offense.

46.   In its documentation as presented by the American Justice Department, the Japanese government submitted no evidence whatsoever that the perpetrator of the alleged offenses at Narita and Katori committed his actions with an intent to damage those structures.   In fact, the Narita police stated almost the exact opposite—that the offender intended to anoint the facilities with oil for religious purposes. Because no evidence of specific intent was before the district court, it erroneously found that the government had established

probable cause to believe that a criminal offense had occurred to support certification of extradition.

47.   As discussed above, under New York law, neither the Temple nor the Shrine sustained any actual damages as a result of the alleged March 2015 events. Thus, for a secondary reason, the district court mistakenly decided that the government had demonstrated that probable cause existed to justify the extradition of Dr. Kanayama.

48.   Furthermore, the government failed to establish, with competent evidence, that Dr. Kanayama was the perpetrator of either the actions at Narita or Katori.

49.   The government's case as to the petitioner's involvement in either supposed crime was threefold.  First, a dental professor in Japan opined that the man seen in the vague still photos from the Narita security video was the same person observed in photos from the Katori security video—and that individual somehow matched the passport photograph of Dr. Kanayama taken sometime in the past.  Second, a car rented by the petitioner had used tollway exits close to the Temple and the Shrine on the date of the purported offenses.  Third, Dr. Kanayama in 2012 had made YouTube videos in which he had referenced prior instances of anointing—which the Japanese government interpreted as "pouring oil"— Buddhist temples and Shinto shrines.

50.   As the petitioner attempted to prove at his initial extradition proceedings in district court through independent expert testimony—an attempt that the court ultimately blocked—the Japanese dental professor had no credentials whatsoever to engage in any type of facial recognition expert testimony.  If this Court accepts the testimony of that independent facial recognition expert, which is attached as Exhibit 30 to this petition and discussed in the accompanying Memorandum, the dental professor's report was totally worthless and unsupportive of probable cause in this case.

51.   Furthermore, as Dr. Kanayama attempted to prove at his initial extradition proceedings through independent expert testimony, which the district court ultimately appeared to have also blocked, the Japanese government mistranslated the petitioner's videos in terms of its reference to "anointment." According to the petitioner's expert, as Japan has no Judeo-Christian tradition, there is no equivalent word in Japanese for "anointment." Ex. 31.  Yet Japan interpreted "anointment" as "pouring oil".  This translation was inaccurate.  A more accurate interpretation would have been "blessing"—or sanctifying with a small amount of oil.

52.   Therefore, the Japanese government's interpretation of the doctor's YouTube videos does not support in any way probable cause that he committed the alleged offenses at issue in this litigation.

53.   If the YouTube videos and the dentist's baseless conclusions are excluded from the probable cause analysis regarding the offender in question, the only evidence supporting the allegation that the petitioner is that offender is the rental car/tollgate documentation.  And that documentation, standing alone— and especially in light of defense evidence to which district court gave minimal weight or did not consider at all—does not support the necessary probable cause finding.

54.   Consequently, the district court mistakenly determined that the government had proved that probable cause existed to support the accusation that Dr. Kanayama was the perpetrator of the Narita and Katori touchings.

## EXHAUSTION OF OTHER REMEDIES

55.   Federal statutory law provides for no direct appeal of a district court's certification of a governmental request for international extradition.

56.   Therefore, the only avenue for judicial review of such a certification is the filing of a petition for writ of habeas corpus.

57.   The government agrees that such a petition, filed under 28 U.S.C. section 2241, is the appropriate means through which an extradition defendant should seek judicial review.

58.  This petition does not challenge the validity of a conviction or sentence.

59.  This petition does not directly involve any immigration proceedings.

60.  No other petition, appeal, motion, or other action has been filed under any jurisdiction to address the district order subject to relief from the potential granting of this petition.

## CONCLUSION

61.  This Court should grant this petition and set aside the original court's certification of the government's request for extradition in this matter.

Respectfully submitted,

DATED:  April 25, 2023            /s/ David M. Dudley

_____

David M. Dudley
Attorney for Petitioner
MASAHIDE KANAYAMA


/s/ Michael Greene

_____

Michael Greene
Local Counsel for Petitioner
MASAHIDE KANAYAMA

**VERIFICATION OF DAVID M. DUDLEY**

I, David M. Dudley, declare as follows:

1.    I am the attorney of record for Petitioner Masahide Kanayama in the matter of his Petition for Writ of Habeas Corpus under 28 U.S.C. section 2241, which is being filed in the United States District Court for the Southern District of New York.

2.    I have read the foregoing Petition and know its contents.  The facts alleged in the Petition are known by me to be true based on my personal knowledge and review of the documents filed in the underlying case.  Because of my familiarity with the testimony and other documents relating to the relevant proceedings in that underlying case, I, rather than the petitioner, am verifying this Petition.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California on April  25, 2023.


_____
  David M. Dudley

**MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2241**

I.

INTRODUCTION

Petitioner Masahide Kanayama is a world-renowned surgeon with a practice in New York City.  That practice specializes in the treatment of endometriosis, a debilitating disease for women in which tissue that normally lines the inside of the uterus, known as endometrium, grows outside the uterus, causing pain, scar tissue, adhesions, and infertility. *See* Exhibit "1", Social Profile of Dr. Masahide Kanayama at page 8.

Dr. Kanayama has pioneered innovative surgical techniques that make him uniquely capable of reversing the effects of advanced-stage endometriosis.  As one of the top practitioners globally in this field, he is frequently called upon to make presentations at medical conferences focusing on endometriosis. Women from across the country and throughout the world travel to New York for consultation with, and often surgery from,  Dr. Kanayama.  The doctor's surgical expertise is unparalleled and he has made vast contributions to the general medical understanding and treatment of endometriosis.  Ex. 1 at 3.

As a committed Christian, the petitioner is also the founder and director of International Marketplace Ministry ("IMM"), a respected non-profit organization he

established in 2013 for the promotion of Christian beliefs and practices in Japan. IMM specifically encourages Christians to establish personal relationships with God and, through those "fellowship[s] with the Lord", to "be awakened" and find their own purposes and callings in life.  Ex. 1 at 4.

Age 60, Dr. Kanayama is a lawful permanent resident of the United States.  He has no criminal history whatsoever here, in Japan, or anywhere else in the world. Ex. 1 at 1.

Japan presently seeks his extradition for two alleged instances of vandalism that occurred on the same day, March 25, 2015, at a Buddhist temple in Narita and a Shinto shrine near Katori.  The purported offenses more particularly involved the placement of a vegetable-based oil with a fingertip on certain objects at those facilities.  Those objects supposedly were stained by such oil but no repairs were ever needed as the stains were temporary and faded away naturally. Ex 5.

While there is a valid extradition treaty between the United States and Japan, that treaty mandates the conduct underlying a request for extradition by either party be a felony offense in both countries.  Contrary to what the Japanese government has claimed through its representative in this case, the United States Justice Department, the actions attributed to the petitioner would not be a crime—let alone a felony—in this country.

The treaty also requires that an appropriate court in the nation from which extradition is requested make a formal determination that there exists probable cause, based upon competent evidence, that an actual crime was committed—and that the individual sought for removal perpetrated that crime.  Here, Japan has presented insufficient evidence to support such a judicial finding of probable cause.

For these reasons, through this Petition, Dr. Kanayama seeks review of the district court order which certified the Justice Department's extradition request. Because  there is no statutory basis for a direct appeal of that order, a petition filed under 28 U.S.C. section 2241 is the appropriate mechanism for obtaining such review.

Should the petitioner be extradited to Japan, he will be facing detention for at least 23 days—and potentially for many more days or even years—unless he confesses to the two crimes which are under investigation.  *See* the Declaration of Dr. Eric Feldman, attached to this Petition as Exhibit "2" at page 1.  (Though an arrest warrant, or sheet, as it is called in Japan, has been issued, no formal criminal charges have yet been filed against him in that country.). There is little chance that a Japanese court will exonerate him—no matter how weak the evidence; no matter how strong his protestations of innocence—as the conviction rate in Japan is over 99%.  Ex. 2

Moreover, because Dr. Kanayama has acted for decades as a Christian missionary in his nation of origin, he faces likely persecution upon his return to Japan.   The Japanese government and society have a history of persecuting Christians. Ex. 1 at 16.   And the petitioner himself has been the subject of anti-Christian vitriol in recent years.  Ex. 1 at  19.

Because the petitioner is from a family of mixed ethnicity—his father Japanese, his mother Korean—he faces an additional level of persecution if he is extradited to Japan, which also has a history of persecuting Koreans, including those who also have some Japanese familial roots.  Ex. 6  Those  individuals of multiple ancestries are known in Japan as "hafu" and they have been systematically mistreated at times. Ex. 7.   Dr. Kanayama personally experienced physical and psychological abuse as a "hafu" growing up in that country.  Ex. 1 at 5.

There is an insufficient legal basis to support the district court's certification of extradition in this case.  And it would be a genuinely tragic loss to the United States for  Dr. Kanayama to be removed from this country, where he has been an indispensable asset, directly and indirectly, to thousands of women suffering from endometriosis—into a Japanese jail, where he will be confined indefinitely unless he confesses, against his will as stated in this Petition, for undertaking actions which were undertaken with benign intent and would neither be felonious, nor even criminal, in America.

## II.

## STATEMENT OF PROCEEDINGS

On April 4, 2015, the police force in Narita, Japan obtained an arrest sheet or warrant for Dr. Kanayama as part of its investigation into two purported events of vandalism—one at a Buddhist temple in the city of Narita, the other at a Shinto shrine in the area of Katori—on the same date, March 25th of that year.  These arrest sheets have been updated in Japan numerous times since the spring of 2015,

On December 12, 2016, the Japanese government sent the U.S. government a Diplomatic Note requesting the extradition of Masahide Kanayama.  The State Department later referred the matter to the Department of Justice.

On May 30, 2017, the DOJ, through the United States Attorney in the Southern District of New York,  filed an extradition complaint against Dr. Kanayama. *See* the Extradition Complaint, attached to this Petition as Exhibit "8".  The case number given to that action in the Southern District was 17-Misc.-1. An arrest warrant was issued for the petitioner pursuant to that complaint.

On June 2, 2017, the United States Marshal's Service executed the  warrant by arresting Dr. Kanayama in NewYork City.   Several days later, a federal magistrate judge ordered the petitioner's release from custody on certain conditions, pending the resolution of the extradition matter.

On August 22, 2017, the government filed its memorandum in support to the extradition request. *See* Exhibit "9". On October 20, 2017, Petitioner Kanayama filed his formal opposition to that request. *See* Exhibit "10". On November 17, 2017, the government filed a reply to that opposition. *See* Exhibit "11". On January 12, 2018, the petitioner filed a sur-reply to that response. *See* Exhibit "12".

On December 6, 2022, District Court Judge Ramos of the Southern District of New York held an extradition hearing on this matter. *See* the transcript of this hearing, attached to this motion as Exhibit "13". The district court then granted the government's request for certification of the petitioner's extradition on January 26, 2023 by written opinion and order. *See* the district court's opinion and order, attached to this Petition as Exhibit "14".

Dr. Kanayama now seeks judicial review of that order. Because there is no statute which allows a direct appeal of that ruling, the appropriate mechanism for pursuing such judicial review is the filing of a Petition for Writ of Habeas Corpus under 28 U.S.C. section 2241. *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir.2011); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir. 1988); *see also* 17 FAM 1623.3.

Pending that review, the petitioner remains at liberty under supervision of the Pre-Trial Services Office for the Southern District of New York with his travel restricted to the United States and his passport in possession of that office. He must

also obtain pre-approval from his pre-trial officer for any trips he makes within this country.  His initial bond of $1,000,000 cash, and the additional security of two properties owned by him, remains in effect.

III.

STATEMENT OF ALLEGED FACTS

According to the Japanese government, On March 25, 2015, a man allegedly touched certain pillars at the Narita-san Shinjoji Temple, a Buddhist facility and major tourist attraction in Narita, with a small amount of vegetable-based oil on his fingertip.  Later that same day, a man allegedly touched some pillars, stairs, and an offering box at the Katori Jingu Shrine, a Shinto facility and tourist attraction, with a small amount of vegetable-based oil on his fingertip.  That man also made a motion with his hand that seemed to be consistent with drizzling some object with a liquid. Ex. 15 at 4.

On April 9, 2015,  the Narita Police Department opened an investigation into what had supposedly occurred at the Shrine and Temple on March 25.  Ex. 16 at 1. At that time, police officers observed small stains on pillars at the Narita facility and on pillars, stairs, and an offering box at Katori.  Ex. 15 at 6.

Even though the directors of both the Temple and the Shrine had already determined that no repairs were needed to the affected areas at their respective institutions, the police instructed them to get repair estimates for the supposed

damages to their structures.  Ex.17 at 2.  The total monetary amount of those two repair estimates was slightly over 20,000 USD.  Ex. 21.

The stains on the objects at the two locations disappeared naturally over the course of time Ex. 17 at 3 .  (There is some question about when the stains actually became no longer visible and the petitioner has developed a timeline which identifies the multiple answers to that question.  *See* Exhibit 18.).  Of course, as mentioned above, the Temple and Shrine directors had already determined that repairs were unnecessary even before the Narita police asked them to obtain repair estimates.  Ex. 17 at 3.

Neither the Buddhist nor the  Shinto facility suffered any loss of use due to the staining, and neither institution suffered any financial damage as a result of the alleged incident.  Ex.16 at 3.

Based upon grainy still photos from security videos at Narita and Katori, the police decided that the same individual conducted both touchings on March 25, 2015.  *See* those photos at Ex.19, 20.  Law-enforcement officers subsequently concluded that Petitioner Masahide Kanayama was that individual, even though they had no eyewitnesses to the alleged staining event.

The officers based that conclusion on three factors.  First, they provided the grainy stills and a copy of Dr. Kanayama's passport photograph to a dental professor named Matsasugu Hashimoto at the Tokyo Dental College, in Tokyo, Japan. Ex.15

at 8.  Hashimoto then produced a brief report offering his personal opinion that "there was a very high possibility" the man pictured in the security photos and the person portrayed in the passport photo were one and the same.  *See* that report, attached as Ex. 22.

Second, the officers reviewed some missionary YouTube videos that Dr. Kanayama had made in 2012 in which he claimed to have previously anointed several structures in Japan. Ex. 23.   The Japanese government interpreted the petitioner's use of the word anointment as "pouring oil."

Third, through the examination of tollway and rental car records, the officers determined that Dr. Kanayama had rented a gray Toyota Prius at  the Narita International Airport around 2:30 p.m. on March 25, 2015 and returned it to the same location on March 26,  2015 about 9:30 a.m. Ex.16.  On March 25 at about 4:30 p.m.,  the petitioner's rental vehicle was driven through a tollway entrance close to the Narita Temple and, on the same date at approximately 4:41 p.m., it passed through a tollway exit  near the Katori Shrine.  Ex.16.  From those records, based upon that timing, the police surmised that Dr. Kanayama could have been the perpetrator depicted in the security still photos.  Ex.16.

IV.

APPLICABLE INTERNATIONAL EXTRADITION LAW

Under 18 U.S.C. § 3184–the federal international extradition statute—the Department of Justice commences extradition proceedings against a purported fugitive from another nation by filing a complaint in a United States District Court, or any other court of the United States, which has personal jurisdiction over that individual.  That court then must eventually decide whether to certify extradition to the foreign government requesting extradition—or to deny such certification.  *See Skaftouros v. United States, supra,* 667 F.3d 144 at 154. The role of the judicial officer is limited to determining whether to certify to the Secretary of State that the accused person is extraditable. 18 U.S.C. § 3184.

That judicial officer must certify extraditability if he or she finds the following to be true: (1) a valid treaty exists; (2) the crime charged is covered by the relevant treaty; and (3) the evidence marshaled in support of the complaint for extradition is sufficient to sustain the charge. *Id.*; *see also Cheung v. United States,* 213 F.3d 82, 88 (2d Cir. 2000).  Such certification, or denial of certification,  takes place after a "hearing" on these issues where "testimony [is] taken before [the court]."

In the present case, both parties have agreed that a valid extradition treaty exists between the United States and Japan.  They have not agreed, however, that

the crimes charged in Japan are covered by the that treaty or that the complainant has submitted sufficient evidence to sustain that charge.

The first of these two contested issues is typically referred to as the requirement of dual criminality.  The second is generally characterized as the requirement of probable cause.

## V.

## THE DISTRICT COURT ORDER

In a relatively brief opinion, the district court granted the government's request for the certification of Dr. Kanayama's extradition to Japan.  Ex. 14.  The court first specifically found that the government had met the requirement of dual criminality—which in the case of the U.S-Japan extradition treaty means that the conduct under investigation by the Narita Police would represent a crime in the United States and also rise to the level of a felony offense.  Ex. 14 at 8-10.  The court second specifically found that the government had met the requirement of probable cause—that it had submitted sufficient competent evidence to support the belief that felony offenses had been committed and that the petitioner was the perpetrator of those offenses.  Ex. 14 at 10-12.

VI.

ARGUMENT

*A. CONTRARY TO THE DISTRICT COURT'S OPINION, THE GOVERNMENT'S EXTRADITION COMPLAINT DOES NOT MEET THE REQUIREMENT OF DUAL CRIMINALITY.*

1.  Dual Criminality in the Context of the U.S.-Japan Extradition Treaty.

To be covered by the U.S-Japan Extradition Treaty, the conduct underlying an extradition request must in both nations  (1) constitute a criminal offense and (2) be serious enough to rise to the level of a felony.  *See* U.S-Japan Extradition Treaty Article II, paragraph 1.  In analyzing this issue of dual criminality, the district court should  determine whether the alleged underlying conduct would  represent a felony criminal offense under federal law, under the law of the state in which the extradition proceeding is held, or under the law of the preponderance of American states.  *See Hu Yau-Leung v. Soscia,* 649 F.2d 914, 918 n.4 (2d Cir. 1981).

In the present matter, the Narita police have issued a warrant for the arrest of Dr. Kanayama as part of an investigation into his alleged violations of Article 260 of the Japanese Penal Code at the Narita Temple and the Katori Shrine.  Article 260 addresses "Damage to Buildings" and, as translated into English, states in relevant part that "a person who damages a building or vessel of another person is punished by imprisonment for not more than 5 years…".

At the extradition proceeding in the district court, the judge considered  New York Penal Law section 145.05 as the comparable crime for the purposes of dual criminality analysis.  Under section 145.05, "[a] person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he or she has such right, he or she…damages property of another person in an amount exceeding two hundred fifty dollars."

Thus, "the proper 'double criminality' inquiry" here would be "if [the petitioner]  had committed the same [alleged] acts in the United States, would a crime have been committed and would it have been a felony?"   *Hu Ya-Leung v. Soscia, Supra,* 649 F. 2d at 918.  Examining the facts set forth in the Japanese request for extradition, as related by the DOJ during the underlying district court proceedings, and considering them in light of some additional, incontrovertible evidence, the appropriate answer to both questions actually is "no".

2. A Brief Summary of Evidence Presented by the Japanese Government or, Alternatively, Is Incontrovertible.

To conduct a dual criminality analysis, we need to understand what essential, specific factual allegations against the petitioner that the Japanese government has made or are essentially indisputable.  Otherwise, it would be impossible to determine whether his purported conduct would have violated NYPL section 145.05.  Based

upon the government's filings and defense documents, which Japan either does not or cannot deny, there are seven circumstances relevant to such an analysis.

First, the perpetrator of the Article 260 violations at the Narita Temple and the Katori Shrine used a finger to place a vegetable-based oil on certain poles at the Temple and the Shrine on March 25, 2015—and used a spraying motion in the direction of some stairs and an offertory box at the Shrine on that same date.  Ex. 9 at 2-4.  Second, the Japanese government believed that Dr. Kanayama was the culprit and applied the vegetable oil in question, per his own supposed admissions regarding prior incidents, for religious purposes.  Ex. 9 at 5.  Third, that shortly after the events of March 25, some stains were observed on a few pillars at Narita—and poles, stairs, and an offertory box at Katori.  Ex. 9 at 3.  Fourth, those stains all disappeared naturally with no human intervention as early by as early as July 11, 2015, Ex.25 at 16 and definitely no later than December 2017.  Exs.  17, 26, 27, 28, 29.

 Fifth, prior to the police intervention, the directors of the Temple and the Shrine had independently concluded that no repairs at their respective facilities were necessary.  Ex. 17 at 11-13.  Nevertheless, the police asked them to obtain such repair estimates.  Ex. at 17 at 9,13.  Those estimates totaled over 20,000 USD.

Sixth, no repairs were ever conducted at either facility.  Ex. 17 at 9, 11, 13. Seventh, neither the Temple nor the Shrine suffered any loss of function, use, or income as a result of the temporary oil staining.  Ex.17 at 12.

3. Petitioner Kanayama's  Alleged Conduct in Japan Would Not Have Violated NYPL Section 145.05.

*a. Section 145.05 Is a Specific Intent Crime and the Japanese Government Has Presented No Evidence of Such Intent.*

New York Criminal Mischief in the Third Degree, as defined by section 145.05, requires a specific "intent to damage property of another person."  In other words, even if the petitioner intended to engage in the act of placing vegetable oil on the objects in question, those supposed actions would not have subjected him to criminal prosecution in New York, absent greater proof of mens era.

The New York statute mandates that, to be guilty of criminal mischief, a defendant must have the "conscious objective" of damaging  property belonging to another individual.  *See  People v. Summer,* 64 A.D.2d 658, 659, 407 N.Y.S.2d 53 (2nd Dept. 1978).  This specific intent is a  necessary element of criminal mischief and the failure of a prosecutor to demonstrate the willfulness of the defendant to damage property will lead to the dismissal of the charge. *See, e.g., People v. Callahan,* 19 A.D.2d 889, 890, 244 N.Y.S.2d 766 (2nd Dept. 1963) ("mischief conviction could not stand in absence of evidence that injury to property was willful").

Japanese Penal Code Article 260 has no such requirement of specific intent. In fact, on its face, that article has no intent requirement whatsoever.  Nevertheless, under Japanese penal law, intent is required for proof of all offenses pursuant to

Article 38.  Article 38 of that code addresses such intent and states, in relevant part, that " (1) [a]n act performed without the intent to commit a crime is not punishable; provided, however, that the same does not apply unless otherwise specially provided for by law. (2) When a person who commits a crime was not aware of the fact that the crime constituted a greater crime, the person is not be punished for the greater crime. (3) A person lacking knowledge of law does not mean a lack of intention to commit a crime; provided, however, the punishment may be reduced in light of the circumstances."

In the United States, a general intent crime compels the prosecution to prove only that "the defendant intended to do the act in question."  On the other hand, a specific intent crime "requires the prosecution  to prove that the defendant intended to bring about a specific consequence through his or her actions, or that he or she perform[ed] the action[s] with a wrongful purpose."  *Cornell Legal Information Institute,* Wex Definitions Team, Definition of "Intent" (2020).

As Article 38 of the Japanese Penal Code states only that an act must be committed with the intent to commit a crime—but not with the objective of bringing about a specific consequence or achieving a wrongful purpose—it  unambiguously sets forth a scienter requirement of general intent.  And that general intent requirement applies to all offenses in that code, "unless otherwise specially provided for by law," including the crime of vandalism  prohibited by Article 260.

Thus, the intent necessary to violate NYPL section 145.05 is specific, while the intent necessary to violate Japanese Article 260 is general.  Consequently, Article 260 and section 145.05 define substantially different crimes.   A defendant committing the same acts toward a property—but without an intent to damage it— would be guilty of 260 but not of 145.05.

Here, through the American government, Japan has presented no evidence that Dr. Kanayama, if he actually performed the alleged conduct at the Temple and the Shrine, did so with the intent of damaging either property.  To the contrary,  the Japanese assertion that the petitioner used a fingertip, and in one instance a drizzling motion with his hand, to place a vegetable-based oil on some objects at Narita and Katori provides strong circumstantial evidence that he had no desire to damage such property in any way.  Ex. 9 at 2-4.  If he had harbored such a desire, he would certainly have used petroleum oil,  paint, acid, a corrosive chemical, a lighter, a nail, a hammer, a screwdriver, or some other object or substance that would have definitely caused grave harm to the affected pillars, stairs, or offering boxes.

Furthermore, the government's memorandum in support of extradition, as part of its effort to prove that the petitioner was in fact the perpetrator never identified by an eyewitness, quotes the doctor from his 2012 YouTube videos as admitting that he had previously "poured oil onto various shrines for religious purposes."  Ex. 9 at 5. This is the only reference in the documentation provided by Japan of what the

petitioner's intent might have been.  And "pouring oil"—or, more accurately, in the security photos presented by the Narita police, "dabbing oil with a fingertip"—*for religious purposes* demonstrates an objective exactly the opposite of an intent to destroy.

Additionally, as will be discussed further in the context of probable cause, "pouring oil for religious purposes" was the Japanese government's translation of the English word "anointment".  As defined by the Holman Bible Dictionary, anointment "describes the procedure of rubbing or smearing a person or thing, usually with oil, for the purpose of healing, setting apart, or embalming. A person can anoint himself, be anointed, or anoint another person or thing." *Holman Bible Dictionary,* Broadman & Holman (1991).  Consequently, if the petitioner, who is a Christian missionary, did actually effect the oil placement at Narita and Katori— which he denies—he would have done so for the objective of healing or setting apart (in a religious manner) portions of those properties, as opposed to damaging them.

Therefore, Petitioner Kanayama's supposed behavior at the Temple and the Shrine would not have violated NYPL section 145.05 or any other possible applicable New York statute.  The district court erred in finding that the government had met the requirement of dual criminality in this case because it failed to recognize that the comparable American law requires a prosecutorial demonstration of specific intent.

*b.  Section 145.05 Requires Actual Damages to the Property at Issue As an Essential Element and the Petitioner's Alleged Conduct Did Not Cause any Such Damage.*

The final essential element of NYPL section 145.05 requires that a defendant has caused "actual damage" to a particular property, not just some sort of speculative damage.  *People v. Hills,* 95 N.Y.2d 947, 948 (2000).  "While no statutory definition of [actual] 'damages' is provided [in New York penal law],  it is commonly recognized that the term contemplates 'injury or harm to property that lowers its value or involves loss of efficiency' and that only 'slight' damage must be proved." *People v. Collins,* 288 A.D. 2d 756, 758 (2001) [internal citations omitted].

"In a criminal mischief case, the damage to property is generally established by evidence of the reasonable cost of repairing the property.  Where the property is not repairable, however, the replacement cost is an appropriate measure of the damage."  *People v. Shannon,* 57 A.D.3d 1016, 1016, 868 N.Y.S.2d 377 (3rd Dept. 2008).

As defined by New York courts interpreting the damage element of NYPL section 145.05, even if Petitioner Kanayama was the perpetrator of the March 25, 2015 events at the Narita Temple and Katori Shrine, he did not effect any actual damage at those properties.  Therefore, he could not have committed the crime of criminal mischief under New York law.

In its extradition request, Japan has presented no evidence whatsoever that the oil-application events at the Temple and the Shrine "lower[ed] the value" of—or

"involve[d] a loss of efficiency at—either facility.  Ex.15.  Further, the Narita police have presented zero evidence that the stainings  caused any closures—or any monetary loss—at the Temple or the Shrine.  Ex.16, 24.  The petitioner's own investigation, based upon interviews of authorities at those institutions, has confirmed that, as a result of the events of March 2015, neither facility closed fully or temporarily, suffered any loss of function or efficiency, faced any loss of revenue, or endured any financial cost at all.  Ex. 17, 25.

Given the lack of functional and financial detriment brought about by those events—and given that the stains were minimal and started to fade naturally right away—the Temple and Shrine directors decided as early as Spring 2015 not to repair any of the affected areas.  Ex.17, 25.  Nevertheless, in April of that year, the Narita police requested that those directors obtain repair estimates for their respective structures.  Ex.16, 17.  Obediently, the directors abided by that request and obtained repair estimates.  Ex.21.  Nevertheless, as the government conceded in its October 2017 reply brief, neither facility conducted any actual repairs.  Ex. 11.  No repairs were undertaken because they were completely unnecessary.  *See* photographs and video included in Ex 5.

In its briefs before the district court, Ex.9, 11, the government claimed that New York case authority, specifically *People v. Fancher,* 116 AD 3d 1084 (2014), had decided that, in situations where repairs had not been conducted, repair estimates

can be used to calculate the damages caused by a criminal mischief defendant.  But an analysis of the *Fancher* opinion, and the one case cited as authority in that document, indisputably leads to the conclusion that the use of such estimates under circumstances of non-repair only applies to instances where demonstrable actual damage—as defined by New York law—occurred.

In *Fancher,* the appellate division of the New York Supreme Court decided that even though one of the appellant's claims had not been preserved for appeal— namely the lack of proof to support the amount of damage he had caused to a vandalized vehicle—it "would have found that an auto body shop owner's estimate of the cost of repairing a vandalized pickup truck provided legally sufficient evidence that the damage exceeded $250, even though the repairs were never performed." *Id.* at 1088.  To support its decision, the *Fancher* court cited only one case, *People v. Agron,* 106 AD 3d 126, 128, (2013)  *lv denied,*21 NY 3d. 1019 (2013).

Because the appellant in *Fancher* had not preserved the issue in question for appellate review, we cannot tell what  happened to the "vandalized pickup truck" from the opinion itself.  Fortunately, this matter was a relatively high-publicity case in the community where it took place.  Thus, from a newspaper account, we can learn that Defendant Fancher "lit a fire in [that] 1988 Chevrolet pickup truck owned

by Delaware Bulldozing." "Man Pleads Guilty in Church Arson, Other Blazes," *The Daily Star,* by Patricia Breakey (October 5, 2010).

Contrary to its citation in *Fancher,* the *Agron* court did not address a situation in which a repair estimate had been obtained by a criminal mischief victim but the repairs at issue had never been conducted. Instead, *Agron* was a case where the victim argued that the defendant's conduct had left the door to an apartment "no longer capable of being locked" because the "'whole frame [had been] jilted." *Id.* at 1129. Therefore, the *Agron* decision essentially approved of the trial court's decision to admit a contractor's estimate for the replacement cost of that door. *Id.* Nothing in the record of that case suggests that the door to that apartment was never replaced—that the residence was permanently left without a door.

Though there is no present way of determining exactly how extensive the arson damage to the pickup truck in *Fancher* was, we can safely assume that such damage reduced its value substantially or resulted in a significant loss of efficiency or function. Of course, in *Agron,* aside from the fact that it does not serve as proper authority for that aspect of the *Fancher* opinion at issue here, the vandalism damage to the door was catastrophic, at least in the sense that the door had to be replaced. Therefore, the government's contention that a repair estimate should be considered an appropriate quantification of actual damage is inapposite—absent separate proof of such actual damage. In other words, the repair estimates obtained by the Temple

and the Shrine—but not acted upon by either of them—do not prove in any way that the petitioner's supposed conduct created actual damage as necessitated by NYPL 145.05.  Despite those estimates, to satisfy dual criminality, the government must still prove that the alleged staining reduced the value of the premises in Narita or Katori— or resulted in a loss of efficiency at those locations.

Of additional importance, interpreting New York state criminal mischief and other statutes in light of a case before it, the United States District Court for the Northern District of New York has recognized a distinction between "defacement" and "actual damage" as defined under applicable state law.  In *U.S. v. Murtari,* Northern District of New York case number 5:07-CR-387, the district court issued an opinion and order addressing a case in which the defendant on multiple occasions wrote messages in chalk on a federal plaza in Syracuse, New York.  As a result of these applications of chalk to public areas, law-enforcement authorities charged that individual with several violations of federal law.

To facilitate review of the defendant's conviction, the district court felt that it was useful to address New York State criminal mischief and graffiti statutes.  *Id.*  In so doing, the court noted that "'[t]he New York Criminal Practice Commentaries state that the damage inflicted should have some degree of *permanency*."  (*Id.,* citing N.Y. Crim. Practice Commentaries 6-62, § 62.03(2) [emphasis added].)  The court's

further analysis of cases from that state led it to conclude that there was a determinative legal difference between "defacement" and "damage":

> "Based on a comparison to New York Law, this court finds that the proof did not show that defendant's actions in this case 'damaged' the property, even though the plaza was 'defaced' by the use of chalk. As stated above, the regulation does not prevent 'defacing' property, and it has been held in various cases that defacing and damaging are not necessarily the same. It is clear that although defendant intended to write in chalk on the plaza, he did not intend to 'damage' the surface."

Based upon this analysis, the district court acquitted the defendant of two counts filed against him.

Likewise, in the *Matter of H.,* 32 A.D. 2d 932 (1969), the appellate division of the New York Supreme Court held that "there was no evidence of actual damage to petitioner's driveway within the meaning of section 145.00 of the Penal Law", where the appellant juveniles had defaced it with chalk.

In further support of this distinction between defacement and actual damage, *People v. Stockwell,* 2008 NY Slip Op 50444 (U) [18 Misc. 3d 1145(A)] considered a case in which the defendant had painted a fence adjoining his property with that of a neighbor, without the permission of that neighbor.  The *Stockwell* court found that, under New York law, such painting did not represent actual damage, a necessary element of criminal mischief. *Id.*  The precise ruling of that court is instructive in this case because it focuses on the inadequacy of the charging document in that

case—a document that is similar to the Japanese government's extradition request in this one;

> "The Court finds that the accusatory instrument viewed either as a complaint or information is not facially sufficient…because the allegations in the factual part of the accusatory instrument along with the supporting depositions/police report fail to provide reasonable cause to believe a violation of PL 145.00(1) occurred due to the conduct of the defendant as there is no allegation of damage to the fence caused by painting it that is damages meaning 'injury or harm to property which reduces its value'."

*Id.*

Here, the government's "accusatory instrument", the Extradition Complaint filed on May 30, 2017, Ex. 8, is also "not facially sufficient" in that it  fails to allege that "actual damage" to the Narita Temple and Katori Shrine occurred, as defined by the American law to which the government asked the district judge conduct a comparison for dual criminality purposes.   And, even if we assume that the petitioner's alleged conduct defaced the Temple and the Shrine temporarily, for whatever time period, such defacement would not itself constituted actual damage under applicable law.   Therefore, the district court erred in finding that the government had met its burden to prove dual criminality because the court failed to recognize that the comparable New York statute mandates proof of actual damages.

*B. CONTRARY TO THE DISTRICT COURT'S OPINION, THE GOVERNMENT'S EXTRADITION COMPLAINT DOES NOT MEET THE REQUIREMENT OF PROBABLE CAUSE.*

1.  Probable Cause in the Context of International Extradition

According to the bilateral extradition treaty between the United States and Japan, "[e]xtradition shall be granted only if there is sufficient evidence to prove…that there is probable cause to suspect, *according to the laws of the requested party*…that the person sought has committed the offense for which extradition is requested ....". *U.S-Japan Extradition Treaty,* Article III [emphasis added].    There are two facets to this necessary probable cause inquiry.  First, under the laws of the requested party—here the United States—there must be probable cause to demonstrate that a real crime was committed.  Second, there must be such cause to prove that the alleged fugitive committed that crime.

Pursuant to 18 U.S.C. § 3184, "the decision to extradite ... must be based on *competent* evidence that would suffice under United States law to hold a defendant for trial, that is, establishing probable cause to believe that the accused committed the crime charged."  *Matter of Extradition of Platko*, 213 F.Supp.2d 1229, 1238 (S.D. Cal. 2002) [citations omitted] [emphasis added].   The probable cause standard used for extradition hearings is "identical to that used by courts in federal criminal preliminary hearings," and the burden remains on the party requesting extradition to produce evidence sufficient to give the magistrate "reasonable ground to believe the

accused [is] guilty" of the charged offense. *Barapind v, Enomoto,* 360 F.3d 1063 at 1069 (9th Cir. 2004); *see also United States v. Howard,* 489 F.3d 484, 491 (2d Cir. 2007). Further, because the Federal Rules of Evidence and Federal Rules of Criminal Procedure do not apply to extradition proceedings—and therefore, hearsay evidence may be admitted— "court[s] must 'closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause.'" *Skaftouros*, *supra,* 643 F. Supp.2d at 543 [citations omitted].

## 2.  Admissibility of Defense Evidence at an Extradition Hearing

At an extradition hearing, the accused "does not have the right to introduce evidence in defense…". *Santos v. Thomas,* 830 F. 3d 987, 992 (9th Cir. 2016). Nonetheless, a court presiding over such a hearing may discretionarily allow the alleged fugitive to present certain testimony and exhibits at the hearing. *Id.*  Such evidence is limited to that which "'explains matters referred to by the witnesses for the government.'" *Id.* [citation omitted].  Evidence "'that merely "contradict[s] the testimony for the prosecution' may be excluded." *Id.* [citation omitted].

"The difference between 'explanatory' and 'contradictory' evidence is easier stated than applied" and "federal courts have struggled to distinguish between the two." *Id.*  Nevertheless, courts seem to have settled on the still rather vague principle that explanatory evidence is that "explains away or completely obliterates probable

cause," whereas contradictory evidence is that which "merely controverts the existence of probable cause, or raises a defense." *Mainero*, 164 F.3d 1199 at 1207 n.7 (9th Cir. 1999).

### 3.  Assuming for Some Reason that the Government Had Met the Requirement of Dual Criminality at the Extradition Proceeding, it Still Failed to Demonstrate Probable Cause that a Violation of NYPL 145.05 Had Occurred.

Assuming for purposes of argument that the government had met the requirement of dual criminality in some manner, it still did not present sufficient evidence to establish probable cause that a violation of NYPL 145.05 had even occurred in this case.  Here, this probable cause determination must be made under the laws of the United States.  *U.S.-Japan Extradition Treaty,* Article III.

As discussed previously, in its extradition complaint, and at the extradition hearing, the government produced no evidence from Japan that the perpetrator of the March 2015 incidents undertook his actions with the specific intent to damage the Narita Temple or the Katori Shrine as necessitated by 145.05.  Moreover, it produced no evidence that any actual damage, as defined by New York law, occurred at either facility.  Given that there was no testimony or documentation before the district court demonstrating that the two most essential elements of the New York criminal mischief statutes had been satisfied, the court erroneously concluded that the requesting nation had met its burden of establishing probable cause that a crime had even occurred on March 25, 2015.

4.  If Explanatory Defense Evidence is Taken Into Consideration, There Was No Probable Cause to Support the Identification of Petitioner Masahide Kanayama as the Perpetrator of the Alleged Vandalism at Narita and Katori.

The Narita police were unable to produce any eyewitnesses to the events of March 25, 2015.  They also collected no forensic proof, such as fingerprints or DNA, to determine the culprit.  Consequently, they relied upon three items of opinion and circumstantial evidence to support their claim that Petitioner Kanayama perpetrated the supposed crimes at the Narita Temple and the Katori Shrine.

First, the Narita police presented grainy black-and-white still photos from security cameras at the Temple and the Shrine to a dental professor in Tokyo who compared those photos to a passport picture taken of Dr. Kanayama at some time in the past.  Based upon a comparison of the photos, the dentist opined that the individual seen at Narita and Katori was the petitioner.  Ex 22 at 10. Second, the police gathered YouTube videos from 2012 and concluded that Petitioner Kanayama had admitted "pouring oil" on certain objects in Japan prior to the making of those videos.  Ex 23. Third, they used tollgate and rental records to place the doctor in the vicinity of Narita and Katori on the March date in question.  Ex 22 at 10.

With the help of extrinsic evidence which explains or obliterates each of these evidentiary claims, we can ascertain without hesitation that no probable cause, as defined in the federal and state courts of America, exists to conclude that the petitioner was the man observed on security cameras at the two facilities.  This

extrinsic evidence was presented to the district court over the course of the extradition proceedings—and the court either minimized such defense testimony and documentation or refused to consider it all.  Ex.  11.

*a. Given that the Japanese Dental Professor Had No Experience or Expertise in Facial Recognition, and Given that an Actual Expert Has Concluded that the Professor's Conclusions Were Fundamentally Flawed, the Petitioner Has Obliterated the Most Important Aspect of the Government's Probable Cause Presentation.*

The Japanese government's  primary proof that Petitioner Kanayama was the perpetrator of the March 2015 events was a "facial recognition" report from a dental professor named Masatsugu Hashimoto.  Ex. 22.  Japan has presented no evidence that Professor Hashimoto had any experience or expertise in facial recognition.  To obtain this report, the Narita police provided him with some grainy black-and-white still photos isolated from security camera videos at the Temple and the Shrine.  (To the best of the petitioner's knowledge, the police have never produced the entire video to anyone, including the DOJ and Dr. Kanayama.)

The Narita authorities then asked Hashimoto to compare those fuzzy photos with a passport picture taken of Dr. Kanayama at some unknown time in the past. Relying on those photos, the dental professor concluded that the individuals observed from the security camera at Narita and Katori were the same person—and that there was a "very high possibility"—not probability—that the petitioner was that person,  Ex. 22.  The professor based that "possibility" primarily on a correlation

of hairlines between the security photo subject and the petitioner's passport photo, even though he clearly had no information about whether Dr. Kanayama's hairline or hairstyle had changed over the course of relevant time.  Ex. 22.

Because Hashimoto had no apparent expertise in facial recognition,  his testimony should have been disregarded completely on that basis—and on the basis that the security stills were of such a poor resolution that no human being could have conducted an accurate facial comparison based upon them.  Nonetheless, the district court cited the professor's opinion in support of its determination that probable cause existed to identify Kanayama as the culprit.  Ex. 14 at 11.  To reach that conclusion, the court was compelled to exclude the opinion report and preferred testimony of a true facial recognition expert produced by the defense—a report that totally undermined Hashimoto's opinion and obliterated to the point of a nuclear wasteland that, most important, component of the government's probable cause identification of the petitioner. Ex. 14 at 11.

According to Dr. Benjamin Bavarian, one of the world's foremost experts on biometric technology and facial recognition, Hashimoto's identification was "fundamentally flawed" and the professor's report was "biased towards [its] conclusions and would fail any *Daubert* inquiry."  Ex. 30_at 2.  Specifically, upon reviewing Professor Hashimoto's report, Dr. Bavarian came to the following pertinent conclusions: i) "the [so-called] expert opinion has been biased toward the

conclusions .... us[ing] circumstantial information" concerning the suspect; ii) the expert failed to "consider[] the multitude of variables and uncertainties inherent to surveillance video [of] such low resolution"; iii) "the features used by [Professor Hashimoto] are not accepted as reliable landmarks as defined in the Biometrics Data International Standards"; and iv) the expert opinion does not meet the standards of *Daubert* and the "best acceptable conclusion is that based on the data presented the result is inconclusive." *Id*. [emphasis added].

Dr. Bavarian finished his presentation by stating that "the data provided in the submitted report is practically useless for the purpose [of] any observational []or analytical study." *Id*. Therefore, the Hashimoto opinion is actually worthless in terms of determining whether the petitioner was at the purported Japanese crime scenes on March 25, 2015.

Bavarian's report completely and indisputably *obliterated* the most critical part of the government's probable cause/identification demonstration during the extradition proceedings. Thus, the district court erred in excluding it from its analysis of probable cause.

And the photographs submitted by Japan are of such poor quality, based upon a comparison of them, no reasonable lay person could have concluded that it was fairly probable Dr. Kanayama was the pictured individual. As a result, the Hashimoto report and accompanying still photos provide no cause whatsoever, let

alone probable cause, to believe that the petitioner perpetrated the touching events in question.

*b. Given that Dr. Kanayama's YouTube Missionary Videos Were Produced Almost Three Years Before the Events at Issue, Given Those Videos Discussed "Pouring Oil", and Given Some Mistranslations of the Videos by the Japanese Government, the YouTube Footage In No Way Supports the Identification of the Petitioner as the Culprit at the Temple or the Shrine.*

As presented by the Japanese government, Dr. Kanayama produced two YouTube videos on November 3 and December 31, 2012, respectively, in which he described his experiences of anointing at least two shrines, two mountains, and three snakes.  Ex. 23 at 15 and May 19, 2015 Narita Police Report [included as the seventeenth exhibit to the government memorandum at page 2.]  Because there is no word for "anoint" in Japanese since the culture of that country has no Judeo-Christian tradition, the Narita authorities translated the words used by the petitioner in his native language, "abura sosogi", very literally as "pouring oil,". Ex. 1 at 17.  According to the government's extradition submissions, these statements by the petitioner represented additional evidence that he was the lawbreaker at the Temple and the Shrine.  The district court accepted that argument and referenced the videos in its finding that probable cause to identify the extradition defendant had been established.  Ex. 14 at 11.

There are at least three critical problems with the government's usage of those statements to identify the doctor as the perpetrator of the March 2015 events.  First,

as the videos were made and released over two years before the events at issue, they clearly do not represent admissions that he was responsible for the incidents at Narita and Katori.   Moreover, in those videos, the petitioner does not state that he was planning to anoint—or, as translated by Japanese officials, "to pour oil on"—any other structures, areas, or snakes in the near or distant future.   Further, from just two videos, one cannot accurately assume that anointing buildings or other objects was a typical or integral part of his Christian missionary practice in Japan.   Any relationship between Dr. Kanayama's videotaped statements in late 2012 and the events of March 2015 is purely speculative.

Second, given the translation of "anointment" as "pouring oil" provided by Japanese authorities, it would be useful to examine the exact meaning of the verb "to pour" in English.   According to the Cambridge English Dictionary, that verb means     "to     make     a substance flow from     a container, especially into another container, by raising just one side of the container that the substance is in" or  alternatively  "to  (cause to) flow quickly and  in large amounts."   *Cambridge Advanced Learner's Dictionary and Thesaurus,* Cambridge University Press (2007). Thus, under the Japanese government's literal interpretation, in the 2012 videos, the doctor was describing several prior instances during which he either released oil from a container onto objects or caused oil to flow quickly and in large quantities.

In the present case, however, there was absolutely no example of such pouring, correctly defined.  The security photos show a man touching some pillars at the Temple and perhaps the same man touching some objects, and raising his hand in a sprinkling motion, at the Shrine.  Ex. 22.  There is no portrayal in those photos of an individual making oil flow from a container or in large amounts.  As a result, the petitioner's YouTube claims about "pouring oil" are factually inapposite to the events at issue in this case.

Third, as noted earlier in this memorandum, the Japanese government's translation of "anointment" is not entirely accurate.  The *Holman Bible Dictionary* states that this term "describes the procedure of rubbing or smearing a person or thing, usually with oil, for the purpose of healing, setting apart, or embalming. A person can anoint himself, be anointed, or anoint another person or thing."  *Holman Bible Dictionary,* Broadman & Holman (1991).

Most important, the oil used in the process of anointment is often called the "chrism".  "Inside a Catholic Church", Thomas Richstatter, O.F.M., *Youth Update,* Cincinnati:  St. Anthony's Messenger Press (1994) at 2.  And chrism can be used *metaphorically*:  "In the N.T. [New Testament] the word is used metaphorically for the grace of the [Holy] Spirit…".  *The Cyclopedia of Biblical, Theological, and Ecclesiastical Literature.* James Strong and John McClintock; Haper and Brothers; NY (1880).

The petitioner's YouTube stories of anointment can be viewed as metaphors for projecting the Christian Holy Spirit onto buildings, physical objects, and even animals.  At least one of Dr. Kanayama's videotaped comments as  cited in the May 2015 Narita Report, when correctly translated, make clear that he was likely using "anointment" and "chrism" metaphorically in the video.

In that comment, which the Narita police translate essentially as disabling snakes by "pouring oil over them," Ex. 23 at 1-3 and May 19, 2015 Narita Police Report, the petitioner actually said "[t]hen the Holy Spirit spoke to me again and told me there were three white snakes on the mountain. I really thought that this was a spiritual metaphor, but I came across three white snakes during my climb and anointed, rendering them impotent."  Independent Translation of November 3, 2012 video, Ex. 23 at 1-3.   Unless the doctor truly poured vegetable oil on the snakes or, even more unlikely, dabbed each of them with oil using his fingers, he was using in this example "anoint" as a metaphor.

Of course, the entire story—and perhaps the entire video—might have been metaphorical—and that possibility showcases the danger of using spiritual narratives, or poems, or rap music lyrics, or any form of personal expression as proof of certain historical facts.  Given that the petitioner's YouTube commentary was at least partially metaphorical, it has absolutely no relation to the events in question.

Because the 2012 YouTube videos were produced over two years prior to the incidents at Narita and Katori, because those incidents had nothing to do with "pouring oil" correctly defined, and because the videotaped statements of Dr. Kanayama were at least partly, and perhaps entirely, metaphorical, they provide zero factual basis for identifying him as the perpetrator of the incidents.  Like the Hashimoto report, this second portion of the government's identification argument fails to establish the necessary probable cause in any way.

*c. Given that the Petitioner Had to Use Certain Tollgates to Travel to and From His Hotel and the Narita Airport, and Given that Almost 10,000 People Visit the Narita Temple Everyday, the Rental Car and Tollway Records Do Not Prove in any Substantial Manner that Dr. Kanayama was the Offender.*

In its initial memorandum, the government also urged the district court to find the existence of probable cause as to the petitioner based on an analysis of  records from tollgates through which a Toyota Prius rented by him traveled on March 25, 2015. Ex. 16 at 14. That Dr. Kanayama was in Japan on that date is indisputable.  It is equally indisputable that he had rented the Prius and drove along the tollway in question, the Higashikanto Expressway    And the government correctly noted that he picked up the car at the Narita Airport and stayed at a hotel in the Chiba prefecture on the night of March 25, specifically a spa resort in the area of Inubosaki, which is located on the Pacific Ocean in Choshi City, which is known for its hot springs.

Nonetheless, a simple explanation, predicated upon minimal and incontrovertible extrinsic defense evidence, undercuts this third part of the

government's probable cause argument:  to travel between the Narita Airport and his hotel in Chosi City most expeditiously, the doctor would have needed to use that expressway  and, more significantly, the tollgate nearest to the Temple on one end of the journey—and the tollgate nearest to the Shrine on the other. *See* Map of Dr. Kanayama's March 25, 2015 Travel, Ex. 32.  More particularly,  a review of that map—which depicts the locations relevant to the present discussion—demonstrates that to access the Expressway from Narita Airport, one has to use the Narita tollgate, the same gate used for travel to the Narita Temple.  And to exit the Expressway in route to the Inubidaki resort, one has to drive through the Sawara-Katori tollgate— the same gate used for travel the Katori Shrine. *Id*.

The fastest route from the airport to the Inubosaki spa involves the use of both the Expressway and the two tollgates at issue.  The tollway analysis presented by the Japanese authorities, therefore, is completely consistent with innocent travel between Narita Airport and the Inubosaki hotel.  The petitioner's use of that route on March 25, 2015 in no way implicates him as the perpetrator of the Japanese penal offenses at the Temple or the Shrine on that date.

Furthermore, every year, over three million people visit the Narita Temple. Ex. 33.  And in 2015, Narita Airport  handled 37.33 million travelers.  Ex. 34. Even if we exclude all other reasons for trips to and from the Narita area, plus transit passengers who traveled though the airport terminals, upwards of 100,000

individuals use the Narita tollgate each day.   That Dr. Kanayama was one of approximately 100,000 persons who traveled through that gate on March 25, 2015, even if we narrow that number down to drivers who used both the Narita and Katori gates on that date, hardly supports a factual basis to support the identification of him as the offender.

Because the numbers of daily Narita tollgate users is so high, and because there is an innocent explanation for Dr. Kanayama's road trip that day—an explanation corroborated by the government's own factual presentation—tollway and rental car analysis supports only in the most minimal manner the Narita authorities' identification of the petitioner.   Yet the district court relied on that analysis to find probable cause.   Ex. 14 at 11.   Such reliance was misplaced as the evidentiary value of the analysis was very low.

*d. Considered in Combination, the Three Portions of the Government's Probable Cause Presentation Provide Insufficient Evidence to Support the Identification of Dr. Kanayama*

While tollgate and rental car records may minimally support the district court's probable cause determination—even though there is an incontrovertible innocent explanation for the petitioner's  tollway trip on March 25, 2015—nothing else does.   Dr. Kanayama's YouTube statements from 2012 are irrelevant to the identification of who committed the 2015 acts at the Temple and the Shrine.   And the dental professor's opinion, based upon still photographs of extremely poor

resolution, is worthless from a forensic standpoint.  Therefore, the district court erred by finding that the government had met the probable cause requirement of identifying the petitioner as the culprit.

VII.

CONCLUSION

Because the government's extradition complaint and subsequent memoranda failed to meet the requirements of dual criminality and probable cause, the district court decided erroneously, as a matter of law, that Petitioner Masahide Kanayama was certifiable for extradition to Japan.  For those reasons, this Court should grant the Petition for Writ of Habeas Corpus by setting aside the judgment certifying such extradition and allowing any other relief necessary to prevent the petitioner's involuntary and unlawful removal from the United States.

Respectfully submitted,


DATED:  April 25, 2023

/s/ David M. Dudley
_____
David M. Dudley
Attorney for Petitioner
Masahide Kanayama

PROOF OF SERVICE


I declare that I am over the age of 18 and not a party to the within cause.  I currently reside in the county of Riverside in the State of California.  A true copy of the attached was emailed to the following:


Scott Kowal,
Chief Pretrial Services Officer
Pretrial Services, Southern District of New York
Scott_kowal@nyspt.uscourts.gov

Tara M. La Morte
Co-Chief, Money Laundering & Transnational Criminal Enterprises Unit
Asset Forfeiture Coordinator
U.S. Attorney's Office
Southern District of New York
TLaMorte@usa.doj.gov


I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 25, 2023.



_____

Margarita J. Mejia