

Photo #29: Image of Oyama Jinja Shrine posted on the Internet, which closely resembles Photo #5

Photo #30: Image of Miho Jinja Shrine posted on the Internet, which closely resembles Photo #13



# Exhibit 24

November 6, 2017

To: The Competent Authority
　　of the United States of America


　　Additional Documentary Evidence concerning the Request for Extradition of Masahide KANAYAMA the suspect in the case of violation of the Damaging a structure

　　The National Police Agency, Japan, respectfully submits the certified copy of additional investigation reports as documentary evidence concerning the request for extradition of the above-mentioned suspect to the Competent Authority of the United States of America.

　　The document submitted herein is duly certified and authenticated together with certified translations in English.



Yasuhiro TSUYUKI
Director-General
Organized Crime Control Department
Criminal Investigation Bureau
National Police Agency of Japan

## List of Exhibits

| No. | Exhibit | Date Prepared | Prepared by | Contents |
|---|---|---|---|---|
| 1 | Investigation report (Certified Copy) | 11/2/2017 | Fumihiko WADA | Report concerning the Narita Shinsho-ji Temple case on the statutory interpretation of the Offense of damage to buildings, whether or not this case constitutes an offense, necessity of punishment |
| 2 | Investigation report (Certified Copy) | 11/2/2017 | Fumihiko WADA | Report concerning the Katori Jingu Shrine case on the statutory interpretation of the Offense of damage to buildings, whether or not this case constitutes an offense, necessity of punishment |
| 3 | Victim statement (Certified Copy) | 10/18/2017 | Yusuke ABE | Victim statement concerning the Narita-san Shinsho-ji Temple case |
| 4 | Victim statement (Certified Copy) | 10/18/2017 | Yusuke TACHIKAWA | Victim statement concerning the Katori Jingu Shrine case |
| 5 | Investigation report (Certified Copy) | 10/29/2017 | Koji HIJIOKA | Report on the interview with staff of Narita-san Shinsho-ji Temple about the talk with the suspect's lawyer |
| 6 | Investigation report (Certified Copy) | 10/29/2017 | Koji HIJIOKA | Report on the interview with staff of Katori Jingu Shrine about the talk with the suspect's lawyer |
| 7 | Investigation report (Certified Copy) | 10/29/2017 | Koji HIJIOKA | Report on the recalculated estimate of repair charges and the remeasurement of the affected portions concerning Narita-san Shinsho-ji |
| 8 | Investigation report (Certified Copy) | 10/29/2017 | Koji HIJIOKA | Report on the recalculated estimate of repair charges and the remeasurement of the affected portions concerning Katori Jingu Shrine |
| 9 | Investigation report (Certified Copy) | 10/31/2017 | Mariko YAMADA | Report on the timeline of the suspect's activities on the date of the crime |
| 10 | Investigation report (Certified Copy) | 10/29/2017 | Koji HIJIOKA | Report on the background of the judge who issued the arrest warrants |
| 11 | Certificate | 11/2/2017 | Yoshimitsu YAMAUCHI | |

Date: November 2, 2017

To:  Public Prosecutor Hiroshi TAZAWA
       Director of Criminal Investigation
       Chiba District Public Prosecutors Office

From:  Fumihiko  WADA
           Public  Prosecutor
           Prosecuting  Attorney
           Chiba District Public Prosecutors Office

# Investigation Report

Offense:   Damage to Buildings
Suspect:   Masahide KANAYAMA

Regarding the suspected case of damage to buildings in Narita-san Shinsho-ji Temple involving Suspect Masahide KANAYAMA, I hereby make the following report on the statutory interpretation of the Offense of damage to buildings, whether or not this case constitutes an offense, mens rea in this offense, necessity of punishment and so on.

I.   Suspected Facts
At around 4:06 p.m. on March 25, 2015, in the premises of Narita-san Shinsho-ji Temple located at 1 Narita, Narita City, Chiba Prefecture, the suspect defaced three poles on the east side of the *So-mon* (Main Gate) under the management of the Chief Temple Manager Shodai KISHIDA, with an oily liquid (causing the monetary damages totaling 120,500 yen).   In this way, the suspect destroyed the structures owned by another.

II.   Offense
       Damage to Buildings

III.   Punitive Articles
        Article 260 (Damage to Buildings; Causing Death or Injury)
        A person who damages a building or vessel of another shall be punished

by imprisonment with work for not more than five years. If such a person thereby causes the death or injury of another, the person shall be dealt with by the punishment prescribed for the crimes of injury or the preceding paragraph, whichever is greater.

IV.    Definition of "building" in the Offense of Damage to Buildings and whether or not the damaged properties in this case can be interpreted as an object of offense

A.    Definition of "Building"

The preceding paragraph of Article 260 of the Penal Code of Japan stipulates that a person who damages a building or vessel of another shall be punished by imprisonment with work for not more than five years.

Regarding the definition of "building" stipulated in the same article, the former Japanese Supreme Court defined the word "building" as "a thing that has a roof and is fixed to the ground by the support of walls and/or poles, and that people at least can go into and out of its inside. (Decision of the Former Japanese Supreme Court, June 20, 1914, Roku Vol.20, P.1300)

The structure which falls under this definition is a "building" stipulated in Article 260 of the Penal Code of Japan, and the poles which form a part of the building are interpreted as an object of the offense.

According to judicial precedent of Japan, among the things attached to a building, the things that cannot be detached without being damaged, such as a ceiling board, threshold, lintel, etc. are treated as an object of the Offense of Damage to Buildings. (Decision of the Former Japanese Supreme Court, April 14, 1914, Shimbun Vol.940, P.26, Decision of the Former Japanese Supreme Court, March 3, 1917, Shimbun Vol.1240, P.31, Decision of the Former Japanese Supreme Court, September 21, 1932, Keishu Vol.11, P.1342, etc.) Regarding the things such as an entrance door that can be detached without being damaged with proper tools, "whether or not a thing attached to a building is an object of the Offense of Damage to Buildings should be determined after considering the degree of intensity of joining the said thing and a building and the functional importance of the said thing to a building." (Decision of the

2

Japanese Supreme Court, March 20, 2007, Keishu Vol.61, P.66)

B.  Question of whether the *So-mon* (Main Gate) constitutes a "structure"
1. In this case, the damaged properties are the three poles on the east side of the *So-mon* (Main Gate), that are essential parts of the structure, located in the premises of Narita-san Shinsho-ji Temple.

2.  According to Yoichi KYOSU, General Affairs Section Chief of Narita-san Shinsho-ji Temple, the structure of *So-mon* (Main Gate) is as follows:

"The *So-mon* (Main Gate) was built in the style of *Goken-sanko-romon* (Five-Bay, Three-Door Tower Gate), one of Japanese traditional architectural styles.  Having started as the project to commemorate the 1070th anniversary of the foundation of Narita-san Shinsho-ji Temple, its construction took about three years and eight months and about two billion yen by its completion. It is a significant symbol of Narita-san Shinsho-ji Temple.

Its architectural style is called *Goken-sanko-romon* (Five-Bay, Three-Door Tower Gate) because it is a two-storied building with a width of five bays, that is, approximately 9.09m, three passages, a roof on top and some space inside for person to enter, and exit.

Though it is a so-called "gate," it is a structure supported by walls and poles and has a roof on top and some space inside for a person to enter and exit."

3.  With all things considered, the *So-mon* (Main Gate) defaced in this incident is a structure which has a roof, is supported by walls and poles and fixed to the ground, has some space inside for a person to enter, stay and leave, and thus it constitutes a "building," stipulated in Article 260 of the Japanese Penal Code.  Therefore, the *So-mon* (Main Gate) in this incident is the object of the offense of "Damage of Buildings."

Though the precedent of the *Daishin-in* (former Supreme Court in Japan) referred to "the front gate (side door)," saying, "when a gate, nothing more than a part offense, just opens and closes for passage, and does not have a space for a person to enter and exit, it does not

constitute a building." (Precedent by *Daishin-in* dated June 20, 1914, page 1300, Roku Volume XX), the *So-mon* (Main Gate) in this case has inner space for a person to enter, stay and leave, and thus it is a "building," even though it is called "*mon* (gate)."

V.   Definition of "damage" in the Offense of Damage to Buildings and whether or not the conduct in this case can be interpreted as an action of causing damage

A.   Definition of "Damage" in the Offense of Damage to Buildings
"Damage" means not only damaging things physically but also damaging their function.
    There are two kinds of function for the structure:
    The original function when used for original purposes; and
    auxiliary function such as aesthetic appearance, imposing appearance, and exterior appearance to augment the original function.
    Even if the total function is not damaged nor destroyed, when any of the function is damaged or destroyed, it can be interpreted that "damage" has been done.
    In this regard, the former Japanese Supreme Court also found "it is sufficient to damage a whole building or a part of it, and for damaging a building, it is not necessary to totally incapacitate its function, and the damaged part of a building is not necessarily a major part of the building." (Decision of the former Japanese Supreme Court, April 19, 1910, Roku Vol.16, P.657)
    Regarding the definition of "damage," the former Japanese Supreme Court defined it in the ruling as "not only altering its physical form or destroying it totally but also render it unusable virtually or emotionally for the intended use." (Decision of the former Japanese Supreme Court, March 7, 1921, Roku Vol.27, P.158) According to this decision, "damage" is not limited to rendering the object physically unusable for the intended use.

B.   Question of whether the vandalism committed in this incident constitutes an "act of damage"

1.  In this case, three poles on the east side of the *So-mon* (Main Gate) of Narita-san Shinsho-ji Temple are the objects of vandalism. According to the statements of Yoichi KYOSU, General Affairs Section Chief of Narita-san Shinsho-ji Temple, and the Investigation Report dated October 29, 2017, prepared by Inspector Koji HIJIOKA, Judicial Police Officer of First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters, the historical, religious and cultural value of Narita-san Shinsho-ji Temple and damages on the *So-mon* (Main Gate) thereof are as follows:

a.  In the premises of Narita-san Shinsho-ji Temple, there are a lot of structures, including the *Hon-do* (Main Hall), besides the structures that are required by the Act on Protection of Cultural Properties to be preserved and managed as cultural assets to be inherited by a future generation:
nationally designated important cultural properties, including the *Nio-mon* (God Vajrapani Gate), *Sanju-no-to* (Three-Storied Pagoda), *Shaka-do* (Shakyamuni Hall), *Gakudo* (Ex-Voto Gallery), and *Komyo-do* (Enlightenment Hall); and
tangible cultural properties designated by Narita City, including the *Issai-kyo-do* (All Sutras Repository).

Since Narita-san Shinsho-ji Temple has structures of historic and cultural value in its premises, the caretakers have managed *So-mon* (Main Gate), the front gate of the temple, with daily care, even if the structure is not designated as a cultural property, thinking that it's their mission to keep it properly for a future generation to inherit.

The temple has about ten million worshippers every year, including a lot of visitors from abroad in recent years, and every worshipper passes through *So-mon* (Main Gate) to enter its precincts.

Narita-san Shinsho-ji Temple as a Buddhist temple considers its precincts as sanctuary, and the place where *So-mon* (Main Gate) now exists is important as a boundary with the sanctuary.

Therefore, *So-mon* (Main Gate) built there is also important to the followers as the object of worship.

The vandalism committed against *So-mon* (Main Gate), one of properties of such a traditional and prestigious Buddhist temple, has had wide-ranging serious effects and has caused a lot of grief for Japanese people by damaging religious symbols important to our national heritage.

b.   By the vandalism committed in this temple, unvarnished portions of three poles on the east side of the *So-mon* (Main Gate) were sprayed with oil-like substance leaving damp stains on each pole as follows:

(1) First pole from south: approx. 4 centimeters long and approx. 2 centimeters wide stain;

(2) Second pole from south: approx. 6 centimeters long and approx. 2 centimeters wide stain; and

(3) Third pole from south: approx. 5 centimeters long and approx. 2 centimeters wide stain.

Those sprayed portions, into which oil-like substance had penetrated, are still left with blackish stains as follows:

(1) First pole from south: approx. 3.5 centimeters long and approx. 1 centimeter wide stain;

(2) Second pole from south: approx. 3 centimeters long and approx. 0.9 centimeter wide stain; and

(3) Third pole from south: approx. 5 centimeters long and approx. 1.5 centimeters wide stain.

2.   As aforementioned, the *So-mon* (Main Gate) is the front gate built in the precincts or the sanctuary of the temple of historic and cultural value, and is a structure regarded as object of worship for its followers.

Therefore, in order to keep the function of the *So-mon* (Main Gate), its beauty, dignity and appearance must be kept, but by this vandalism, the structure was sprayed over with oil-like substance and defaced.   I can say that, by the vandalism, the utility of the *So-mon*

(Main Gate) was diminished both in fact and in the minds of the public, and that, considering the fact that the stained condition has not been restored, it is obvious that its function has been substantially diminished.

Therefore, the act of spraying over and defacing three poles on the east side of the *So-mon* (Main Gate) constitutes a "damage," stipulated in the offense of "Damage to Buildings," the Article 260 of Japanese Penal Code.

3.    I might add that the precedent of *Daishin-in* (the former Supreme Court in Japan) refers to the significance of a "damage" in the said Article, in which the judge rejected the defense lawyer's claim that a "damage" only refers to a physical one, and, as aforementioned, ruled that a "damage" in the said article refers not only to the act of physical damage but also to the act of rendering a thing virtually and emotionally unusable for the intended use (Precedent by *Daishin-in* dated March 7, 1921, page 158, Roku Volume XXVII).

The main idea behind this ruling lies in the fact it doesn't exclude the act of diminishing the "beauty, dignity and appearance," essentially collateral function, from the interpretation of a "damage."

Incidentally, on March 7, 1951, the Tokyo High Court, in a ruling against the defendant who cut open the roof of a factory and installed a gas exhaust pipe there, referred to the same issue whether or not the act by the said defendant constitutes a "damage" stipulated in Article 260, the offense of "damage of a building," and reasoned that, ("Even if a person makes some physical changes on a part of a building, it doesn't constitute a "damage" stipulated in the Article 260 of Japanese Penal Code, as far as his/her conduct is a repair or improvement work necessary and appropriate for the building and it does not diminish the function of the building,") and that "the act by the defendant is both a necessary measure required by the Labor Standards Act and an appropriate repair or improvement work which kept the changes to a minimum.   The conduct by the defendant didn't diminish the function of the building in the least, rather increased its function," and, on the grounds that the said conduct by the defendant was done following the

law and didn't diminish the function of the building, rather increased its utility, ruled that the said conduct did not constitute "damage."(Criminal Case Ruling Bulletin issued by Tokyo High Court, dated March 7, 1951, page 36, Volume XXI)   However, it is obvious that the conduct by the defendant in this ruling is completely different from the one in our case.

4. Yoichi KYOSU, General Affairs Section Chief of Narita-san Shinsho-ji Temple, refers to several methods of restoring three poles on the east side of the *So-mon* (Main Gate) to the condition before the incident: washing off only the stains could spoil the beauty of the temple further, and so they are not able to begin the restoration work unless the sprayed substance is identified so they can properly restore the damage; Replacing the current poles with the new ones is expected to cost the temple an enormous sum, and the brand-new poles would not match the wear and tear of the other old parts of the temple, which could also spoil the harmonized beauty of the temple; In addition, no matter which method they take, they must keep off tourists and worshippers while the restoration work is under way.   With all things considered, the temple is not able to begin restoration work yet.

VI.   Mens rea in the Offense of Damage to Buildings

Mens rea in the offense of damage to buildings means damaging an object physically by a wrongful conduct or understanding/acknowledging that the function of an object would be damaged.

In this respect, the suspect physically damaged the three poles on the east side of the *So-mon* (Main Gate) in this case by smearing or sprinkling oil-like substance over the *So-mon* (Main Gate) with his own hands, and it is recognized that the suspect understood/acknowledged that his conduct would damage the accompanying functions.   The aesthetic appearance, imposing appearance, exterior appearance of the *Somon* are all actively compromised by the damage.   These facts are sufficient to find that the suspect had mens rea.

Even though the suspect had religious purposes that inspired his crime, his mens rea is undeniable.

VII.   Conclusion

8

As stated above, an action of damaging the *So-mon* (Main Gate) in Narita-san Shinjo-ji Temple by spreading oil-like substance comes under Article 260 of the Penal Code of Japan or the Offense of Damage to Buildings.

The statutory penalty of damaging buildings is imprisonment with work for not more than five years.   As there is no room for imposing a fine, this offense is a felony.

Furthermore, in this case, the suspect damaged highly valued buildings from the Japanese historic, religious and cultural point of view explicitly for the purpose of damaging their function.   As there are many highly valued buildings from the historic, religious and cultural standpoint of view, if similar cases of vandalism occurred one after another, and if important cultural properties were damaged in succession, damage would be enormous.

Especially, the suspect committed the crime not only at the Narita-san Shinsho-ji Temple but also at the Katori Jingu Shrine on the same day.   The suspect should be all the more seriously pursued for criminal responsibility.

Therefore, Suspect should be punished severely not only because of maliciousness of the case but also from the standpoint of general prevention of crime.   This is not in any way related to whether or not he had a religious motive or to the suspect's background such as his birth and personal history.

VIII.   Reference Documents
    A. Statement dated October 18, 2017, by Yoichi KYOSU, General Affairs Section Chief of Narita-san Shinsho-ji Temple to a Judicial Police Officer
    B. Investigation Report dated October 29, 2017, prepared by Inspector Koji HIJIOKA, Judicial Police Officer, First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters

Date: November 2, 2017

To:  Public Prosecutor Hiroshi TAZAWA
       Director of Criminal Investigation
       Chiba District Public Prosecutors Office


From:  Fumihiko  WADA
          Public  Prosecutor
          Prosecuting  Attorney
          Chiba District Public Prosecutors Office

## Investigation Report

Offense:   Damage to Buildings
Suspect:   Masahide KANAYAMA


Regarding the suspected case of damage to the buildings in Katori Jingu Shrine involving Suspect Masahide KANAYAMA, I hereby make the following report on the statutory interpretation of the Offense of damage to buildings, whether or not this case constitutes an offense, mens rea in this offense, necessity of punishment and so on.


I.   Suspected Facts

At around 5:02 p.m. on March 25, 2015, in the premises of Katori Jingu Shrine located at 1697 Katori, Katori City, Chiba Prefecture, the suspect defaced a black pole located in the west front of the worship hall and another black pole located in the east front of the worship hall, and also black stairs and a black offertory box located in front of the worship hall, both under the management of Priest Shoji TAKAHASHI, with an oily liquid (causing the monetary damages totaling 2,423,248 yen).   In this way, the suspect destroyed the buildings owned by another.


II.   Offense
       Damage to Buildings

1

III.    Punitive Articles

Article 260 (Damage to Buildings; Causing Death or Injury)

A person who damages a building or vessel of another shall be punished by imprisonment with work for not more than five years.  If such a person thereby causes the death or injury of another, the person shall be dealt with by the punishment prescribed for the crimes of injury or the preceding paragraph, whichever is greater.

IV.    Definition of "building" in the Offense of Damage to Buildings and whether or not the damaged properties in this case can be interpreted as an object of offense

A.  Definition of "Building"

The preceding paragraph of Article 260 of the Penal Code of Japan stipulates that a person who damages a building or vessel of another shall be punished by imprisonment with work for not more than five years.

Regarding the definition of "building" stipulated in the same article, the former Japanese Supreme Court defined the word "building" as "a thing that has a roof and is fixed to the ground by the support of walls and/or poles, and that people at least can go into and out of its inside. (Decision of the Former Japanese Supreme Court, June 20, 1914, Roku Vol.20, P.1300)

The structure which falls under this definition is a "building" stipulated in Article 260 of the Penal Code of Japan, and the poles which form a part of the building are interpreted as an object of the offense.

According to judicial precedent of Japan, among the things attached to a building, the things that cannot be detached without being damaged, such as a ceiling board, threshold, lintel, etc. are treated as an object of the Offense of Damage to Buildings. (Decision of the Former Japanese Supreme Court, April 14, 1914, Shimbun Vol.940, P.26, Decision of the Former Japanese Supreme Court, March 3, 1917, Shimbun Vol.1240, P.31, Decision of the Former Japanese Supreme Court, September 21, 1932, Keishu Vol.11, P.1342, etc.) Regarding the things such as an entrance door that can be detached without being damaged with proper tools, "whether or not a thing attached to a building is an object of the

2

Offense of Damage to Buildings should be determined after considering the degree of intensity of joining the said thing and a building and the functional importance of the said thing to a building." (Decision of the Japanese Supreme Court, March 20, 2007, Keishu Vol.61, P.66)

B.   Question of whether the damaged properties in this case are an object of the offense

    1.   The damaged properties in this case are:
        the square pole on the east in front,
        square pole on the west side in front,
        stairs,
        and the offertory box
of the *Haiden* (Hall of Worship) located in the premises of Katori Jingu Shrine. (hereafter referred to as "the *Haiden*, etc.")

    2.   According to Ryuzo KODA, General Affairs Division Director of Katori Jingu Shrine, the structure of the *Haiden* (Hall of Worship) is as follows:

        "The *Haiden* (Hall of Worsihp) of Katori Jingu Shrine is a wooden one-story *Gongen-zukuri* style architecture, which has stairs, poles, a roof and walls, and it has a space a person can physically enter and exit.

        *Gongen-zukuri* is one of architecture styles of the *Haiden* (Hall of Worsihp), and the *Haiden* built under this style is connected with the *Honden* (Main Hall), a sacred space that nobody is allowed to enter as the deity is enshrined therein, by a roofed corridor called *Ishino-ma* or *Aino-ma.*

        The roof of the *Haiden* (Hall of Worsihp) of Katori Jingu Shrine is thatched with Japanese cypress bark in *hiwada-buki* style, a Japanese long distinguished style.   A triangularly shaped decorative roof gable on the front side called *chidori-hafu* higher and grander than usual is black-lacquered and furnished with gaudily colored *kaeru-mata*, a fork-shaped decoration.

        The space in front of stairs facing the front of the *Haiden*

(Hall of Worship) is for *jiyu-sanpai* (free worshipping), and the offertory box is located at the center of the stairs. This offertory box is designed by a special order to fit to the stairs and be a part of the *Haiden* (Hall of Worship).

Each shrine has a *Honden* (Main Hall), in which the deity is enshrined, and a *Haiden* (Hall of Worsihp), in which worship is offered to the deity in the *Honden* (Main Hall). The *Haiden* (Hall of Worsihp) usually consists of two spaces; one for *shoden-sanpai* (worshipping inside sanctuary), a worship offering inside the *Haiden* (Hall of Worsihp), and the other for *jiyu-sanpai* (Free worshipping), in which worship can be offered by anybody. Every shrine has an offertory box in front of the *Haiden* (Hall of Worsihp), to which worshippers make donations of money to express appreciation for daily protection provided by deity."

3.   All of the above things considered, the *Haiden* (Hall of Worsihp) of Katori Jingu Shrine defaced in this case is a structure which has a roof, is supported by walls and poles and fixed to the ground, has some space inside for a person to enter and exit, and thus it constitutes a "building" stipulated in Article 260 of the Japanese Penal Code.

Therefore, the *Haiden* (Hall of Worship) and the stairs and the offertory box, both combined with the *Haiden* (Hall of Worship), are the objects of the offense of Damage to Buildings.

V.   Definition of "damage" in the Offense of Damage to Buildings and whether or not the conduct in this case can be interpreted as an action of causing damage

A.   Definition of "Damage" in the Offense of Damage to Buildings
"Damage" means not only damaging things physically but also damaging their function.

There are two kinds of function:

original function when used for original purposes; and

accompanying function such as aesthetic appearance, imposing appearance, and exterior appearance to make the most of their original

4

function.

Even if the total function is not damaged nor destroyed, when any of the function is damaged or destroyed, it can be interpreted that "damage" has been done.

In this regard, the former Japanese Supreme Court also found "it is sufficient to damage a whole building or a part of it, and for damaging a building, it is not necessary to totally incapacitate its function, and the damaged part of a building is not necessarily a major part of the building." (Decision of the former Japanese Supreme Court, April 19, 1910, Roku Vol.16, P.657)

Regarding the definition of "damage," the former Japanese Supreme Court defined it in the ruling as "not only altering its physical form or destroying it totally but also render it unusable virtually or emotionally for the intended use." (Decision of the former Japanese Supreme Court, March 7, 1921, Roku Vol.27, P.158) According to this decision, "damage" is not limited to rendering the object physically unusable for the intended use.

B. Question of whether the vandalism committed in this incident constitutes an "act of damage"

1.   In this case, the two square poles on the east and west side in front, the stairs and the offertory box of the *Haiden* (Hall of Worship), located in the premises of Katori Jingu Shrine are the objects of vandalism. According to the statements of Ryuzo KODA, General Affairs Division Director of Katori Jingu Shrine, and Investigation Report dated October 29, 2017, prepared by Inspector Koji HIJIOKA, Judicial Police Officer of First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters, the historic, religious and cultural value of Katori Jingu Shrine and damages on the *Haiden* (Hall of Worship) thereof are as follows:

a.   In its premises, Katori Jingu Shrine has important cultural properties such as the *Honden* (Main Shrine) and the *Romon* (Tower Gate), nationally designated tangible cultural properties such as the *Haiden* (Hall of Worship), the *Heiden* (Hall of Divine Offering) and the *Shinsenden* (Hall of Divine Food Offerings),

5

tangible cultural properties designated by Chiba Prefecture such as the *Kitoden* (Hall of Prayer), and cultural properties designated by Katori City such as the *Hokura* (Treasure House) and the *Shintoku-kan-omote-mon* (Front Gate of *Shintoku-kan*). The shrine also keeps national treasures in storage.

Katori Jingu Shrine is the *Sohonja* (Head Shrine) of about four hundred Karoti *Jinja* (shrines) nationwide. The *Sohonja* is the shrine whose divine spirit is divided to be enshrined by other affiliated shrines. Katori Jingu Shrine is said to have been founded in the reign of Emperor Jimmu, the first Emperor of Japan. It's a historic shrine whose history is as long as that of the country of Japan.

The shrine is highly appreciated for its cultural value and attracts as many as two million worshippers a year.

b. By the vandalism committed in this shrine, the two square poles on the east and west side in front, the stairs and the offertory box of *Haiden* (Hall of Worship) were sprayed with oil-like substance leaving damp stains or damp spotted blackish stains on each property in the following sizes:

(1) The square pole on the west in front: approx. 39 centimeters long and approx. 13 centimeters wide;

(2) The square pole on the east in front: approx. 15 centimeters long and approx. 9 centimeters wide;

(3) The stairs: approx. 205 centimeters wide and approx. 145 centimeters long; and

(4) The offertory box: approx. 165 centimeters wide and approx. 90 centimeters long.

Those sprayed portions, though dried now, are still visible as blackish stains or black spotted stains in the following sizes:

(1) The square pole on the west in front: approx. 22 centimeters long and approx. 10.5 centimeters wide;

(2) The square pole on the east in front: approx. 12.5 centimeters long and approx. 2.5 centimeters wide;

(3) The stairs: approx. 205 centimeters wide and approx. 145 centimeters long; and

(4) The offertory box: approx. 165 centimeters wide and approx. 90 centimeters long.

2.  As aforementioned, the *Haiden* (Hall of Worship), etc. are nationally designated tangible cultural properties, being built close to *Honden* (Main Shrine), an important cultural property and sacred building, in the premises of Katori Jingu Shrine of historic, religious and cultural value.

Therefore, in order to keep the function of the *Haiden* (Hall of Worship), etc. as the sacred building for worshippers to do a *Shoden-sanpai* (worshipping inside sanctuary) or a *Jiyu-sanpai* (Free worshipping), its beauty, dignity and appearance must be kept, but by this vandalism, the building was sprayed over with oil-like substance and defaced.  I can say that, by the vandalism, the function of the *Haiden* (Hall of Worship), etc. was diminished both in fact and in the minds of the public, and that, considering the fact that the stained condition has not been restored, it is obvious that its function has been substantially diminished.

Therefore, the act of spraying or applying oil-like substance and defacing the *Haiden* (Hall of Worship), etc., constitutes a "damage" stipulated in the offense of "damage of a building," the Article 260 of the Japanese Penal Code.

3.  I might add that the precedent of *Daishin-in* (the former Supreme Court in Japan) refers to the significance of a "damage" in the said Article, in which the judge rejected the defense lawyer's claim that a "damage" only refers to a physical one, and, as aforementioned, ruled that a "damage" in the said article refers not only to the act of physical damage but also to the act of rendering a thing virtually and emotionally unusable for the intended use (Precedent by *Daishin-in* dated March 7, 1921, page 158, Volume XXVII).

The main idea behind this ruling lies in the fact it doesn't exclude the act of diminishing the "beauty, dignity and appearance," essentially collateral function, from the interpretation of a "damage."

Incidentally, on March 7, 1951, the Tokyo High Court, in a ruling against the defendant who cut open the roof of a factory and installed a gas exhaust pipe there, referred to the same issue whether or not the act by the said defendant constitutes a "damage" stipulated in Article

7

260, the offense of "damage of a building," and reasoned that, （"Even if a person makes some physical changes on a part of a building, it doesn't constitute a "damage" stipulated in the Article 260 of Japanese Penal Code, as far as his/her conduct is a repair or improvement work necessary and appropriate for the building and it does not diminish the function of the building,"） and that "the act by the defendant is both a necessary measure required by the Labor Standards Act and an appropriate repair or improvement work which kept the changes to a minimum.  The conduct by the defendant didn't diminish the function of the building in the least, rather increased its function," and, on the grounds that the said conduct by the defendant was done following the law and didn't diminish the function of the building, rather increased its utility, ruled that the said conduct did not constitute "damage."(Criminal Case Ruling Bulletin issued by Tokyo High Court, dated March 7, 1951, page 36, Volume XXI)   However, it is obvious that the conduct by the defendant in this ruling is completely different from the one in our case.

4.   Ryuzo KODA, General Affairs Division Director of Katori Jingu Shrine, refers to the work of restoring the *Haiden* (Hall of Worship), etc., to the condition before the incident.   If they make repair works only on the damaged portions, the repaired portions would be out of harmony with other already lacquered portions, which could infringe the law restricting changes on designated cultural property, and thus, other structures near the stained spots need overcoating as well.   Moreover, while the restoration work is under way, they have to keep off visitors and worshippers.   With all things considered, the shrine has not been able to begin restoration work yet.

VI.   Mens rea in the Offense of Damage to Buildings

Mens rea in the offense of damage to buildings means damaging an object physically by a wrongful conduct or understanding/acknowledging that the function of an object would be damaged.

In this respect, the suspect physically damaged the Hall of Worship, etc., in this case by smearing or sprinkling oil-like substance over the *Haiden* (Hall of Worship), etc., with his own hands, and it is recognized that the suspect understood/acknowledged that his conduct would damage accompanying

function such as an aesthetic appearance, imposing appearance, exterior appearance, etc. of the *Haiden* (Hall of Worship), etc.  These facts are sufficient to find that the suspect had mens rea.

Even though the suspect had religious purposes, that cannot deny his mens rea.

VII.  Conclusion

As stated above, an action of damaging the Hall of Worship, etc. in Katori Jingu Shrine by spreading oil-like substance comes under Article 260 of the Penal Code of Japan or the Offense of Damage to Buildings.

The statutory penalty of damaging buildings is imprisonment with work for not more than five years.   As there is no room for imposing a fine, this offense is a felony.

Furthermore, in this case, the suspect damaged highly valued buildings from the Japanese historic, religious and cultural standpoint of view for the purpose of damaging their function.   As there are many highly valued buildings from the historic, religious and cultural standpoint of view, if similar cases of vandalism occurred one after another, and if important cultural properties were damaged in succession, damage would be enormous.

Especially, the suspect committed the crime not only at the Katori Jingu Shrine but also at the Narita-san Shinsho-ji Temple on the same day.   The suspect should be all the more seriously pursued for criminal responsibility.

Therefore, Suspect should be punished severely not only because of maliciousness of the case but also from the standpoint of general prevention of crime.   This is not in any way related to whether or not he had a religious motive or to the suspect's background such as his birth and personal history.

VIII.  Reference Documents

A. Statement dated October 18, 2017, by Ryuzo KODA, General Affairs Division Director of Katori Jingu Shrine to a Judicial Police Officer

B. Investigation Report dated October 29, 2017, prepared by Inspector Koji HIJIOKA, Judicial Police Officer, First Investigation Division, Criminal Investigation Department, Chiba Prefectural Police Headquarters

# STATEMENT

Address: 205 Azuma-cho, Narita City, Chiba Prefecture　　　Phone: 0476-22-2111

Occupation: Temple Administrator (General Affairs Section Chief of Narita-san Shinsho-ji Temple)

　　　　　　　　　　　　　　　　　　　　Cell Phone: 090-2676-0556

Name of Witness: Yoichi KYOSU

Date of Birth: September 20, 1956 (61 years)


　　*On October 18, 2017, the above-mentioned witness made the following statement to me, the police officer, of his own free will at Narita-san Shinsho-ji Temple, address: 1 Narita, Narita City, Chiba Prefecture.*

I.　I am now assigned as General Affairs Section Chief of Narita-san Shinsho-ji Temple.

　　The officer of Chiba Prefectural Police would like to ask me about the structure of the *So-mon* (Main Gate) of our temple, one of the damaged sites, the current condition of the damaged portions and restoration work on them in connection with their investigation into the case in which oily liquid was sprayed over several structures in shrines/temples in Chiba Prefecture.　I will answer his questions.

2.　First, let me explain my position and responsibilities at Narita-san Shinsho-ji Temple.

　　As the General Affairs Section Chief of our temple, I am in charge of the section that manages contractors engaged in works on our whole premises, such as cleaning companies and security companies.

3.　Now, I will explain about the structure of *the So-mon* (Main Gate).

　　In this case, the damages were found on three poles on the east side of *the So-mon* (Main Gate).

　　*The So-mon* (Main Gate) was built in the style of *Goken-sanko-romon* (Five-Bay, Three-Door Tower Gate), one of Japanese traditional architectural styles.　Having started as the project to commemorate the 1070th anniversary of the founding of Narita-san Shinsho-ji Temple, its construction took about three years and eight months and cost about two billion yen by its completion.　We can say that it is a symbol of Narita-san Shinsho-ji Temple.

　　It is called as *Goken-sanko-romon* (Five-Bay, Three-Door Tower Gate) because it is a two-storied building with a width of five bays, that is, approximately 9.09m, three passages and a roof on top.

1

It is a so-called "gate," and it is supported by walls and poles and has a roof on top and some space inside that people can enter and exit, and this "gate" is built on the premises of Narita-san Shinsho-ji Temple.

Because the exactly three poles exist exactly where they are now, we can say this gate is built in the traditional architectural style of *Goken-sanko-romon*. In other words, the three damaged poles are essential parts of the *So-mon* (Main Gate).

4. Next, I will explain how the poles of the *So-mon* (Main Gate) are damaged.

In this incident, the three poles of the *So-mon* (Main Gate) of our temple were sprayed with oily liquid leaving blackish oily stains.

The stains were left in spots spreading a few centimeters long and wide, all of which are within the range of an average person's eye height.

When the damages were found, they really looked wet with oil, but they are dried now with black stains left.

The sprayed portions began gradually drying two or three days after the incident, and they became black stains as you can see now.

The poles of the *So-mon* (Main Gate) have been exposed to direct sunlight on sunny days, wind and rain on rainy days. Indeed, natural deterioration changes the texture of the poles made of unvarnished wood. However, when the wood grain absorbs other substances, like oil, the substance will remain in the wood, indicated by the visible stains.

When you look at the sprayed portions at close range, you can easily see unnatural black stains, obviously different from normal changes made by sunlight, rain or wind.

On the premises of Narita-san Shinsho-ji Temple, we have a lot of structures, including the *Hon-do* (Main Hall), besides the structures that are required by the Act on Protection of Cultural Properties to be preserved and managed as cultural assets to be inherited by a future generation:

nationally designated important cultural properties, including *Nio-mon* (God Vajrapani Gate), *Sanju-no-to* (Three-Storied Pagoda), *Shaka-do* (Shakyamuni Hall), *Gakudo* (Ex-Voto Gallery), and *Komyo-do* (Enlightenment Hall); and

tangible cultural properties designated by Narita City, including *Issai-kyo-do* (All Sutras Repository).

It is evident that Narita-san Shinsho-ji Temple has structures of immense historic and cultural value on its premises, and that we have managed not only those culturally important ones but all the other buildings of the temple with daily care. It's our mission to keep them properly for a future generation to inherit, and even if the *So-mon* (Main Gate)

2

and some of other buildings are contemporary additions, they are still critically important structures for the whole temple complex.

Narita-san Shinsho-ji Temple has about ten million worshippers every year.   Every worshipper passes through the *So-mon* (Main Gate) to enter our precincts, and Narita-san Shinsho-ji Temple as a Buddhist temple considers its precincts as sanctuary.

In other words, the place where the *So-mon* (Main Gate) now exists is important as a boundary for the sanctuary, and the *So-mon* (Main Gate) built there is also important to the followers as the object of worship.

I might add that two billion yen, the cost of construction of the *So-mon* (Main Gate), were covered by generous donations from followers of Narita-san Shinsho-ji Temple.

Since the international airport in our vicinity brings in a lot of visitors from abroad in recent years, we extend our best hospitality to them.

I believe that our friendly activities are known to many people all over the world.

The vandalism committed against the properties of such a dedicated temple has had wide-ranging serious effects and cause a lot of grief for Japanese people by damaging religious symbols important to our national heritage.

5.   Now, the damaged structures need to be restored, but we have not been able to begin the restoration work.

We asked a company specialized in construction and restoration of Buddhist temples and Shinto shrines to make an estimate for the restoration work.   The following was their reply.

> "To restore the *So-mon* (Main Gate) to the condition before the incident, the whole poles must be replaced because the grain of wood has absorbed oil, and such a replacement would cost the temple an enormous sum.   The most affordable way to partially restore the damage would be to wash off stains only.
>
> We must apply some chemicals for washing them off, and if we wash them off without identifying the substance sprayed, the washed portions could possibly remain noticeable because of the previous damage."

Since the restoration work could compromise the beauty of our temple further, we are not able to begin the restoration work unless the sprayed substance is identified.

Additionally, replacing the current poles with the new ones is also expected to cost us an enormous sum, and the brand-new poles would be conspicuous compared with the others.   This could also spoil the beauty of our temple as I similarly mentioned regarding partial washing of the damage with chemicals.

3

Furthermore, rebuilding the *So-mon* (Main Gate) is not a financially realistic scenario, considering the fact that its original construction cost us about two billion yen.

In addition, no matter which method we take, we must keep off tourists and worshippers while the restoration work is under way.   This would amplify the already significant financial hardship associated with the types of restoration work we are currently looking into.    Considering such financial losses, we are not able to begin restoration work yet.

6.    Around June this year, a man presenting himself as the attorney for the offender of this case contacted us, and around July this year, the lawyer came to our temple.

A couple of days after his visit, a letter of agreement drafted under the name of General Manager of Narita-san Shinsho-ji Temple was mailed to us along with a note asking us to seal and mail it back.    In short, the letter of agreement said the following:

> "The lawyer representing Masahide KANAYAMA apologized to us about what KANAYAMA did to us.
>
> Costs of restoration have been fully covered by them.
>
> We don't wish punishment on the offender, Masahide KANAYAMA."

The letter of agreement was drafted under the name of the General Manager of our temple without his consent, and they asked us to seal and mail it back.   We were concerned with their aggressive attitude and unable to accept their request.

Now, I'll submit a copy of the letter of agreement to you for your reference.

   (*At this point, I, the police officer, decided to attach a sheet of the letter of agreement titled "Nensho," which the witness submitted to us of his own free will, at the end of this statement.*)


As I mentioned before, Narita-san Shinsho-ji Temple is of very high cultural and historic value, and the *So-mon* (Main Gate) is our front gate or "face."   We feel terribly sorry that oily liquid was sprayed over that *So-mon*, and stains that are hard to remove are left there even now.

As the media has been reporting, similar vandalism has been committed against properties of temples nationwide, irritating many people.

We would like the police to arrest and severely punish such malicious criminals.


Yoichi KYOSU (seal)

4

After I recorded the witness's statement as above, I read it out to him and let him read it.   He confirmed it is true and correct and affixed his signature and seal to the end of the statement.

On the same day mentioned above

Sergeant  Yusuke  ABE

Judicial Police Officer

First Investigation Division

Criminal Investigation Department

Chiba Prefectural Police Headquarters

Dispatched  to  Narita  Police  Station  for  support

5

..................................., 2017

To whom it may concern,

Shodai KISHIDA
General Manager
Narita-san Shinsho-ji Temple
5-32-9 Tamatsukuri, Narita City
Chiba Prefecture 286-0011

Letter of Agreement

On April 13, 2015, I, the above-named, filed a victim's report with Narita Police Station for the oil-spray damage on sixteen buildings including the *Daihon-do* (Great Main Hall) in our premises.

We had an estimate made for cleaning the oil stains and found it was 120,500 JPY (consumption tax excluded).

Then, with no cleaning done, the stains began fading away by the wind, rain, or sunlight, leaving only slight stains now.

The other day, the lawyer representing Masahide KANAYAMA, the suspect who sprayed the oil over our buildings, came to our temple, made apologies to us and compensated the damage.

Therefore, we, Narita-san Shinsho-ji Temple, do not wish Masahide KANAYAMA to be punished.

P.S. I wrote your address and name according to those written on the victim's report. Please correct them if they are different from ones listed in your *Tokibo-tohon* (real estate register copy) .

October 18, 2017
Koichi KYOSU (Seal)

*Note: The date and signature handwritten by Koichi KYOSU and his seal affixed in the last two lines means that the interviewee confirmed that this copy of "Letter of Agreement" would be attached to his statement prepared by the police officer.*

# STATEMENT

Address: 2-35 Sawara I, Katori City, Chiba Prefecture    Cell phone: 090-8962-5072

Occupation: Shinto Priest                                    Phone: 0478-57-3211

Name of Witness: Ryuzo KODA            Date of Birth: January 1, 1960 (57 years of age)

 

*On October 18, 2017, the above-mentioned witness made the following statement to me, the police officer, of his own free will at Katori Jingu Shrine, address: 1697-1 Katori, Katori City.*

1. I'm going to answer the questions asked by the police officer about the structures of the *Haiden* (Hall of Worship), the damages and restoration work on it in connection with the vandalism case where an oily substance was sprayed over the structures comprising the Katori Jingu Shrine in 2015.

2. First, here is the information as to who I am and my relation to Katori Jingu Shrine.

   I am the General Affairs Division Director of Katori Jingu Shrine.

   I'm ranked as *Negi* (Priest).   The highest rank of Shinto Priest is *Guji* (Chief Priest), followed by *Gon-guji* (Deputy Chief Priest), then *Negi* (Priest) and finally *Gon-negi* (Deputy Priest), which means my rank is the third highest one.

   My main task is administrative work, including organizing management meetings and managing the personnel affairs as a religious corporation.

   The major events held in Katori Jingu Shrine such as *Tsuitachi-sai* (First Day of Month Festival) which is held on the first day of every month, *Saitan-sai* (New Year Festival) and *Onikku-hajime-sai* (Commencement of Daily Offering) held on January 1 of every year, and *Ohare-e* (Great Purification) and *Joya-sai* (New Year's Eve Festival) held on December 31 of every year, are conducted by other *Gon-negi* (Deputy Priest).

3. Next, here is information about the Katori Jingu Shrine.

   The Katori Jingu Shrine is the *Sohonja* (Head Shrine) of about four hundred Karoti Jinja (shrines) nationwide.   A *Sohonja* is the shrine whose divine spirit is divided to be enshrined by other affiliated branch shrines.

   The term "*Jingu*" is a title given to shrines, which now means one of a few shrines that have direct connection with the Imperial Family.   Among approximately 80,000 shrines

1

nationwide, there are only 17 *Jingu,* and Katori Jingu Shrine is one of these historic shrines.

Before the Meiji Era (1868-1912), there were only three shrines given the title "*Jingu*" in Japan along with other two: Ise Jingu and Kashima Jingu.

Katori Jingu Shrine is said to have been founded in the reign of Emperor Jimmu, the first Emperor of Japan.    It's a historic shrine whose history is as long as that of the country of Japan.    On our premises, we have important cultural properties such as *Honden* (Main Shrine) and the *Romon* (Tower Gate), nationally designated important cultural properties such as the *Haiden* (Hall of Worship), the *Heiden* (Hall of Divine Offering) and the *Shinsenden* (Hall of Divine Food Offerings), tangible cultural properties as designated by Chiba Prefecture such as the *Kitoden* (Hall of Prayer), and cultural properties as designated by Katori City such as the *Hokura* (Treasure House) or *Shintoku-kan-omote-mon* (Front Gate of Shintoku-kan).    We also retain several artifacts designated as national treasures in storage.

We are highly appreciated for our cultural value to the nation and attract as many as two million visitors a year.

4.    Now, let me tell you about the *Haiden* (Hall of Worsihp) in question.

Each shrine has a *Honden* (Main Hall), in which the deity is enshrined, and a *Haiden* (Hall of Worsihp), in which worship is offered to the deity in the *Honden* (Main Hall).

The *Honden* (Main Hall) is a sacred structure that nobody is allowed to enter.

The *Haiden* (Hall of Worsihp) usually consists of two spaces; one for *Shoden-sanpai* (worshipping inside sanctuary), a worship offering inside the *Haiden* (Hall of Worsihp), another is for *jiyu-sanpai* (Free worshipping), in which worship can be offered by anybody. I believe that the *Haiden* (Hall of Worsihp) is most like a sacred room of Christian churches where prayers are offered.

Every shrine has an offertory box in front of the *Haiden* (Hall of Worsihp), to which worshippers make donations of money to express appreciation for daily protection provided by the deity.

In other words, the *Haiden* (Hall of Worsihp) needs places where visitors can offer worship to the deity and make donations so that they can express their appreciation to the deity, and that the role expected of the *Haiden* (Hall of Worsihp) is fulfilled.

The *Haiden* (Hall of Worsihp) of Karoti Jingu Shrine is a wooden one-story *Gongen-zukuri* styled structure, built on the premises of Karoti Jingu Shrine, and has stairs,

2

poles, roof and walls.   So, people can physically enter it, stay in it, and leave it.

*Gongen-zukuri* is one of the possible architecture styles of a *Haiden* (Hall of Worsihp), and a *Haiden* built under this style is connected with a *Honden* (Main Shrine) by a roofed corridor called *Ishino-ma* or *Aino-ma.*

As aforementioned, the *Haiden* (Hall of Worsihp) of Karoti Jingu Shrine is a structure nationally designated as tangible cultural property.   Its roof is built in the *hiwada-buki* style, a Japanese long distinguished style of thatching a roof with bark of cypress.   A triangularly shaped decorative roof gable on the front side called *chidori-hafu* higher and grander than usual is black-lacquered and furnished with gaudily colored *kaeru-mata*, a fork-shaped decoration.

The space in front of the stairs facing the front of the *Haiden* (Hall of Worship) is for *jiyu-sanpai* (Free worshipping), and the offertory box is located at the center of the stairs.

This offertory box is designed by a special order to fit to the stairs and be a part of the *Haiden* (Hall of Worship).

5.   Here is my account of the damages on the *Haiden* (Hall of Worship).

The damaged portions of the *Haiden* (Hall of Worship) were two square poles on both sides of its front stairs, the front stairs themselves and the offertory box fixed onto the stairs.

When the incident was detected, the damaged portions were very noticeably stained with oil.   The oil sprayed over the poles appeared to have dripped downward along them, while countless oval-shaped oily stains were found all over the stairs and offertory box.

I should tell you about where the stains were left.   The stains on the poles were left as high as an average person's eye height.   As for the stairs and offertory box, if you had fixed your eyes on the offertory box, your vision would have been filled with oval-shaped stains.

When about a year passed after the incident, the sprayed portions began to look dried. About half a year ago from now, their colors came close to the color of lacquer and the stains were almost invisible unless observing at close range.

6.   On October 6, this year, we requested an estimate of restoration work of the damaged portions of the *Haiden* (Hall of Worship) again to a restoration company specialized in the construction and restoration of shrines and temples.   Their estimate of the restoration was 2,423,248 JPY.

The company explained to us about the estimate:

3

that they need to lacquer the affected areas again to restore the damaged portion;

that they cannot apply an overcoat only to the damaged portions as every lacquering work needs undercoating;

that they first need to flake off the lacquered surface and remove the oily substance before the overcoating since the oily substance sprayed has not been identified; and

that the actual expenses for restoration work could be over their estimate.

I might add that, if you restored only on the damaged portions of the *Haiden* (Hall of Worship), namely the poles, stairs and offertory box, the repaired portions would be noticeably different from other already lacquered portions such as other poles, stairs, walls and corridor, which could infringe the laws restricting changes on designated cultural property. Apparently, other structures near the stained spots need overcoating, and therefore, actual expenses for whole restoration work are expected to be over their estimated figure.

In fact, the damaged portions for which the police asked us to make an estimate are only a part of whole damages, and, when we are ready to start restoration, we need to have the whole damaged portions restored together. We need to know the best restoration plan for each portion depending on the circumstances and need an assessment by the expert again.

Moreover, while the restoration work is under way, we have to take measures to prevent visitors and worshippers from entering our premises, which would surely cause secondary financial damage to us following the first physical damages on our properties.

These are the reasons why we have not been able to start restoration work until today.

It's a fundamental problem, and you can reasonably understand that we have been already been victimized by vandalism and are now suffering from the double damage since we have to perform a restoration work at our own expenses. To put our feelings plainly, we cannot restore the damaged properties because the offender has not made compensation for our loss. I would like you to understand our feelings as a victim.

7. That's about it, but I have to say we are all pained by these damages.

Around June or July this year, a lawyer who claimed to represent the offender of this case visited us and a letter of agreement was mailed to us afterwards. It was drafted under the name of our Chief Priest, and in summary said:

4

"The attorney representing the offender made apologies for the case.

We received the reimbursement for the costs of repair.

Katori Jingu Shrine will not seek punishment against the offender, Masahide KANAYAMA."

In short, they drafted the letter of agreement under our chief priest's name without his consent, and asked us to seal and return it.

Indeed, the attorney explained to us that Masahide KANAYAMA had committed the crimes at Katori Jingu Shrine and Narita-san Shinsho-ji Temple, that KANAYAMA admitted to the crimes, and asked us not to pursue punishment on him in exchange for their apologies and compensations. However, we did not receive any apology or compensation and had told him that we wanted his apologies and atonement for the crimes because it was a matter of our feelings and cannot be solved by money.

This arrogant one-sided mail made us feel we were treated lightly, which hurt us even more.

I'll submit a copy of the mailed letter of agreement for your reference.

*(At this point, I, the police officer, decided to attach a sheet of the letter of agreement titled "Nensho," which the witness submitted to us of his own free will, at the end of this statement.)*

To be honest, we want him to admit his guilt, return to Japan, and apologize to us.

We also wish him to be duly punished in accordance with the Japanese laws as he violated it.

Ryuzo KODA (seal)

After I recorded the witness's statement as above, I read it out to him and let him read it. He confirmed it is true and correct and affixed his signature and seal to the end of the statement.

On the same day mentioned above

Sergeant Yusuke TACHIKAWA

5

Judicial Police Officer

First Investigation Division

Criminal Investigation Department

Chiba Prefectural Police Headquarters

Dispatched to Narita Police Station for support

July 13, 2017

To whom it may concern,

Shoji TAKAHASHI

Chief Priest

Katori Jingu Shrine

I 3169 Sawara, Sawara City

Chiba Prefecture 287-0017

Letter of Agreement

On April 10, 2015, I, the above-named, filed a victim's report with Katori Police Station for the oil-spray damage on buildings including the *Haiden* (Hall of Worship) in our premises.

We had an estimate made for cleaning the oil stains and found it was 24,223,248 JPY (consumption tax excluded).

Then, with no cleaning done, the stains began fading away by the wind, rain, or sunlight, leaving only slight stains now.

The other day, the lawyer representing Masahide KANAYAMA, the suspect who sprayed the oil over our buildings, came to our shrine, made apologies to us and compensated the damage.

Therefore, we, Katori Jingu Shrine, do not wish Masahide KANAYAMA to be punished.

P.S. I wrote your address and name according to those written on the victim's report. Please correct them if they are different from ones listed in your *Tokibo-tohon* (real estate register copy) .

October 18, 2017

Ryuzo KODA (Seal)

*Note: The date and signature handwritten by Ryuzo KODA and his seal affixed in the last two lines means that the interviewee confirmed that this copy of "Letter of Agreement" would be attached to his statement prepared by the police officer.*

Date: October 29, 2017

To: Superintendent Kosaku YAMADA
    Judicial Police Officer
    Chief of Narita Police Station

From: Inspector Koji HIJIOKA
        Judicial Police Officer
        First Investigation Division
        Criminal Investigation Department
        Chiba Prefectural Police Headquarters
        Dispatched to Narita Police Station for support

Corroborative Investigation Report

Regarding the cases that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report on the interview with the staff of Narita-san Shinsho-ji Temple about the comments made to the suspect's lawyer.

I.   Date of interview
    October 29, 2017

II.  Place of interview
    Narita-san Shinsho-ji Temple
    Location: 1 Narita, Narita City, Chiba Prefecture
    Interviewee: General Affairs Section Chief Yoichi KYOSU and
               Property Administration Section Chief Isamu TERAUCHI

III. Interview result
A.  Confirmation with Yoichi KYOSU and Isamu TERAUCHI
    I asked the above KYOSU and TERAUCHI whether or not either of them commented to the lawyer as described in the following parts in question excerpted from the lawyer's declaration:
    Part in Question 1: It was the police who approached me to file the (victim's) report.
    Answer 1: Neither KYOSU nor TERAUCHI said things like that.
    We decided to file the report after having an in-house discussion. How

1

could we tell the lawyer that the police urged us to file it?

Part in Question 2: Prior to their (police) arrival at the Temple, I had no idea that any oil had been sprayed anywhere in the Temple.

Answer 2: We did not say things like that.

At 6:44 p.m. on March 25, 2015, one of our security guards deployed at the entrance of the *Korin-kaku* (Aureole House) stepped on oil spread over the floor, and that was the damage first found.   Before long, we gradually found out that oil-like liquid was sprayed on several spots of the structures in our premises.   Anyway, we are sure that we have not given the lawyer such a detailed account.

Part in Question 3: The police requested me to check to see if we had been an oil splashing target.

Answer 3: We are not sure whether or not we said that to the lawyer.

Back then, the damages done to our properties reminded us of vandalism cases reported in the media, and we strongly suspected that we also fell victim to the same crime.   When we were trying to get the full extent of damages and discussed whether to report the incident to the police, Narita Police Station warned us to look out for similar incident as those reported in the media.   This is how we decided to file the report. We would never explain to the offender's lawyer such detailed exchange of words with the police.

Part in Question 4: I had not previously noticed the stains, even though we had walked by those pillars on many occasions for weeks.

Answer 4: We are not sure whether we said things like that to the lawyer.

As we said before, triggered by finding the first damage in our premises, we started looking for and gradually found other damages. As far as we remember, we didn't give to the lawyer the detailed account of how we came to know the whole damage.

Part in Question 5: The police provided an estimated date for me ranging from March 25 at 3:00 p.m. to April 9, 2015 at 8:00 a.m.

Answer 5: As far as we remember, we didn't give such a detailed account to the lawyer.

The damage was extensive and we looked for and found some of damaged properties with police officers.   As far as the victim's report is concerned, we read the report drafted by the police on our behalf, confirmed that it is true and correct before submitting it to them, but we do not think that we mentioned to the police how we filed the report, because

we had no obligation or intention to do so.

Part in Question 6: The police asked me to obtain a professional estimate of the cost of cleaning the three stains and the estimate that the cleaning service provided me was 125,000 yen.

Answer 6: The estimated amount of repair work is as you can see on the written estimate we have submitted to the police.

As far as we remember, we didn't explain the estimate to the lawyer. We don't think we gave him the figure.    After meeting him in person, the lawyer mailed us a letter of agreement drafted in favor of his client, which mentioned 125,000 JPY in exchange for out-of-court settlement.    Indeed, it even puzzled us why the offender's lawyer knew the estimate amount.    We do not think that we had mentioned the figure to him.

Part in Question 7: Yet the stains had only darkened the brown color of the pillars without changing their shape or damaging them.    Because the pillars' appearance was unaltered, we continued to display the Temple to the public without interruption.

Answer 7: We didn't tell things like that to the lawyer.

To the contrary, I clearly remember that when the lawyer told us that the stains are no longer conspicuous, we found it very offensive and talked back saying that some of stains are still conspicuous.

We've never told him about the displaying or closing down the facilities of our temple.

Part in Question 8: After a while, the stains faded away naturally, without any cleaning whatsoever, so we never ordered repairs for which the estimate had been given.    Presently, the stains are so faded that you can barely even see them.

Answer 8: We've never told the lawyer about the changing condition of sprayed portions or our restoration effort.

B.  Confirmation with Yoichi KYOSU

I asked KYOSU whether or not he commented to the lawyer as described in the following part in question excerpted from the lawyer's declaration:

Part in Question: Kiyosu (KYOSU) was clear that the Temple had not effected any cleaning of the stains or done anything at all to repair the pillars and had no intention of doing so in the future.

He indicated that the Temple had suffered no financial loss as a consequence of the staining. Further, he stated that the Temple had suffered no loss of use or revenue resulting from the sprinkling of the pillars.

3

Answer: I would never say that we have "suffered no financial loss" or "suffered no loss of use or revenue."

The vandalism, which spoiled the cultural value of our temple, has already caused a financial loss, and when the restoration work actually begins, we will have to keep out visitors and worshippers, which would probably cause additional financial loss.

Because we confirmed the damages, we filed a victim's report.  How can we say the contrary?  We didn't agree to sign the agreement that the lawyer drafted in favor of his client and mailed to us, which clearly shows our feelings as victim and our wish to have the offender punished.

C.  Purification

When I asked them about the reason why salt and *sake* (rice wine) are used for Buddhist purification, they stated as follows:

- Narita-san Shinsho-ji Temple belongs to the *Singon* sect of Buddhism.
- The followers of the *Shingon* sect conduct the ritual of purification, in which they use not salt or *sake* (rice wine) but water.
- In Japan, people generally purify themselves by throwing salt over their shoulders after attending a wake or funeral, but strictly speaking, this is not a Buddhist rite but just one of the customs among the Japanese public.  There is no established theory when it comes to why salt is used.
- Spraying oil makes things dirty and is none of Buddhist customs and beyond our imagination.

4

Date:  October  29,  2017

To: Superintendent Kosaku YAMADA
      Judicial Police Officer
      Chief of Narita Police Station, Chiba Prefecture

From:  Inspector  Koji  HIJIOKA
Judicial  Police  Officer
First Investigation Division
Criminal Investigation Department
Chiba Prefectural Police Headquarters
Dispatched to Narita Police Station for support

Corroborative Investigation Report

Regarding the cases of structural damages in Narita-san Shinsho-ji Temple and Katori Jingu Shrine on March 25, 2015, I hereby report on the interview with Katori Jingu Shrine staff about the words exchanged with the suspect's lawyer.

I.   Date of interview
     October 29, 2017

II.  Place of interview
     Katori Jingu Shrine
     Location: 1697 Katori, Katori City, Chiba Prefecture
     Interviewee: Deputy Priest Kazuhiro SAGAWA

III. Interview result
     A.  Confirmation with Kazuhiro SAGAWA
         I asked him whether or not he had commented to the lawyer comments as described in the following parts in question excerpted from the lawyer's declaration:
         Part in Question 1: I don't remember the exact date that one of our cleaners found oil-like stains on places such as the front stairs of the worship hall, the offering box, a pillar of the tower gate, the log house's front door, and the Shrine building.  So I checked and found that the stains were the remnants of an oil-like substance, the smell of which I did not like. Nevertheless, there were no physical changes to the stairs, the offering box, the pillar, the log house, or the building.

1

Answer 1:  Our priest on night duty was the first to find oil-like liquid stains on the stairs and the offering box, when he opened the front door of the Hall of Worship around 5 p.m. on March 26, 2015.   We reported it to the police later, and the whole damages were gradually revealed.

However, I do not think I gave a detailed explanation like this to the lawyer.

We filed a victim's report because we felt victimized.   Thus, it cannot be true that I talked as if the damages were light or nothing.

Part in Question 2:  Consequently, we continued to display the entire shrine to the public as usual without repairs or interruption.   Though we did not feel the need to contact the police about the oil sprinkling, the Katori police came to the shrine and explained that other temples and shrines had experienced oil-sprinkling incidents.   After being provided that explanation, we agreed with the police to file a report.

Answer 2:  I never said such a thing as "we did not feel the need to contact the police about the oil sprinkling."   The police came because we reported it, and so it is natural that we explained the damages to the police.

It is also natural that we filed a victim's report afterward.   We would never have contacted the police without intending to file a victim's report.

However, I do not believe I explained these matters to the lawyer, although I do not remember for sure.

Part in Question 3:  After interviewing me, an officer of the Katori Police Station filled out a Victim's Report and asked me to place my name, address, and seal on the form where indicated.

Answer 3:  A police officer fills out a victim's report on behalf of the victim and asks for his/her signature and seal after the victim confirms it.   The officer, of course, shows where to sign and seal too.

I don't think I told the lawyer why and how our victim's report was filed.   I will not answer to that question even if he asks.

Part in Question 4:  The information contained in the report concerning the personal characteristics of the sprinkling culprit were not provided by me; the police officer himself placed that information onto the report.

Answer 4:  As I said in the previous answer, a police officer fills out a victim's report on behalf of the victim.   We did provide the police with information on the damages, recent security camera images, and affected areas. He filled it out according to our explanations, and I signed and sealed it after confirming what he wrote for me.   I do not remember telling the lawyer how I had filed a victim's report.

Part in Question 5: Because  the  police  asked  me  to  obtain  a

2

professional estimate for repairs to the shrine due to the oil stains, I did so and was provided with an estimated cost of 2,423,248 yen.

Answer 5:   I do not remember explaining the estimate to the lawyer.

He mailed us a letter of agreement with a settlement amount, but I had no idea how they came up with that amount.   I do not believe I told the lawyer the estimated amount.

Part in Question 6:  After submitting that written estimate to the police as requested, I did not see any need for ordering the repairs and we continued to display the Shrine as usual.

Answer 6:   I'm not sure whether I said that.

An estimate is a predicted amount at the time of ordering repairs, and therefore, is not the same as repair.   There are certain legal requirements to fulfill before we have them repaired, and repairs will not start without compensation from the offender.   I would never tell the lawyer such a thing as "I did not see any need for ordering the repairs."

Part in Question 7: After a while, the stains faded away naturally. Currently, they are no longer visible and we have no plans to conduct any cleaning or repairs.

Answer 7:   I think I said there were some parts where stains became invisible, but that does not mean all stains faded away.   I must have told him about the parts where stains still remained too.

We cannot have repairs even though we want to, and so we, the victim, never say something convenient for the offender such as "we have no plans to conduct any cleaning or repairs."

Part in Question 8: The Shrine did not undertake any cleaning or repairs of the affected areas at any time and had no need or intention to do so in the future. He told me that the Shrine had suffered neither a financial loss, nor a loss of usage or revenue, as a result of the staining incident.

Answer 8:   Same as the previous question.

A financial loss occurred when the liquid was sprinkled.   It does not matter whether repairs have been conducted.   When we have repairs in the future, we have to keep visitors out of some areas.   This can be said to be the second damage.   I would never say that the Shrine suffered neither a financial loss, nor a loss of usage or revenue.   In the first place, Lawyer TAKAESU explained to us that Masahide KANAYAMA committed the crimes at Katori Jingu Shrine and Narita-san Shinsho-ji Temple, that Masahide KANAYAMA admitted his involvement, and that he hoped the Shrine would accept his apology and compensation and not seek his punishment.   The lawyer proposed an out-of-court settlement before actually making an

3

apology and compensation.

In this context, it cannot be true that I said we had no intention to have them repaired.  I cannot help but think that he is making such a claim in retaliation of our refusal to accept out-of-court settlement.

B.  Purification

I asked why salt and *sake* are used for traditional Japanese purification, and Interviewee SAGAWA explained as follows:

- There are two types of purification: *sei* and *jo*. Oftentimes, *sei* refers to physical cleansing, while *jo* refers to religious and spiritual one.
- There is a theory that salt started being used for purification because people cleansed their body with seawater in the past when they suffered a misfortune and/or natural disaster.
- A festival (*matsuri*) means to wait (*matsu*) for deity. There is also a theory that people began to sprinkle s*ake* to drive out evil spirits because it is offered to deity at a festival meant to wait for deity.
- Neither of them is an established theory as there are many more.
- As for salt, we have a practice of sprinkling it over the shoulders when coming back from a funeral and placing a pile of salt in front of the entrance or in the direction of northeast, which is traditionally considered ominous.
- As for *sake*, we place a bottle or glass of it on a household Shinto altar as an offering and sprinkle it over the ground where a misfortune happened and somewhere related to it.
- We have no habit of sprinkling salt and *sake* over the Hall of Worship or other buildings or in the shrine premises.
- Purification by salt and *sake* is completely different from sprinkling oil. It is an act of vandalism.

C.  Japanese lacquer coating of Katori Jingu Shrine's Hall of Worship

I asked about the Japanese lacquer coating applied on Katori Jingu Shrine's Hall of Worship, and Interviewee SAGAWA explained as follows:

- Lacquer is different from paint. It is a well-known fact that lacquer is applied on traditional Japanese crafts, and that lacquered furniture and tableware is sold as quality products in Japan.
- The damaged Hall of Worship has its roof thatched with Japanese cypress bark in an antique style called *hiwadabuki*. The gable called *chidori hafu* higher and grander than usual is adopted for the front side, coated with black lacquer, and also designated as important national cultural property.

Date:  October  29,  2017

To: Superintendent Kosaku YAMADA

Judicial Police Officer

Chief of Narita Police Station

From:  Inspector  Koji  HIJIOKA

Judicial Police Officer

First Investigation Division

Criminal Investigation Department

Chiba Prefectural Police Headquarters

Dispatched to Narita Police Station for support

Investigation Report

Regarding the suspected vandalism cases relating to the suspect Masahide KANAYAMA that occurred in Narita-san Shinsho-ji Temple and Katori Jingu Shrine, I hereby report about the recalculated estimate of repair charges and the remeasurement of the affected portions in order to determine the damage to Narita-san Shinsho-ji Temple.

I. Recalculated estimate of repair charges

(i) Date of receipt of estimate

October 12, 2017

(ii) The person who requested the estimate

Narita-san Shinsho-ji Temple

(Yoichi KYOSU, Chief of General Affairs Section)

Location: 1 Narita, Narita City, Chiba Prefecture

(iii) Receiver of the estimate

Sergeant Yusuke ABE

Judicial Police Officer

First  Investigation  Division,  Criminal  Investigation  Department,  Chiba

1