UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

MASAHIDE KANAYAMA,

        Petitioner,

-against-                              23 CV 3469 (CM)

SCOTT KOWAL, Chief of U.S. Pre-       :
Trial Services SDNY, and DOES 1-10,

        Respondent.

_____x

## DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS

McMahon, J.:

      The Government of Japan seeks the extradition of Masahide Kanayama ("Petitioner") so

that he can face charges on two counts of damaging religious and historical shrines, in violation of

Article 260 of the Japanese Criminal Code. The Government of Japan alleges that on March 25,

2015, Petitioner used an oily liquid (1) to deface various portions of the Narita-san Shinsho-ji

Temple in Narita, Japan (the "Temple"), which is a Buddhist temple close to 1,100 years old that

contains a number of nationally designated cultural properties, and (2) to deface various portions

of the Katori Jingu Shrine in Katori, Japan (the "Shrine"), established 643 BCE, which is one of

the few historical shrines in Japan that is connected with the Imperial Family and likewise

contains a number of naturally designated cultural properties. These ancient and holy sites are

extraordinarily important to Japan and its people, and Petitioner's defacement of them is alleged

to have caused approximately $21,300 in damage.

1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/11/24

On January 26, 2023, my colleague, The Hon. Edgardo Ramos, issued an Order,

certifying to the United States Secretary of State that Kanayama is extraditable. (*See* GX-5).

Judge Ramos found that: (1) the Government had met its burden of demonstrating: (1) "dual

criminality"— which, in the case of the U.S-Japan extradition treaty, means that the conduct

under investigation by the Narita Police would represent a crime in the United States and also rise

to the level of a felony offense (PX 14 at 8-10); and (2) probable cause— that the Government had

submitted sufficient competent evidence to support the belief that felony offenses had been

committed and that the Petitioner was the perpetrator of those offenses. (*Id.* at 10-12).

On April 25, 2023, Kanayama filed a petition for a writ of habeas corpus, pursuant to 28

U.S.C. § 2241, that essentially rehashes—with some new "expert" testimony—the arguments he

previously made to and were rejected by Judge Ramos; namely, that the Government failed to

meet its burden of demonstrating "dual criminality" and probable cause. Throughout his motion,

Kanayama—a renowned gynecological surgeon who has developed an innovative and

immensely successful surgical technique for treating endometriosis, making him one of the pre-

eminent surgeons of his kind not only in this country, but in the world (Petition Exhibit 1)—

suggests that the Court should grant the writ on humanitarian grounds, as well:

> The Japanese government is seeking the extradition of the petitioner
> from the United States as part of an investigation concerning two
> alleged instances of vandalism which would almost certainly be charged
> as misdemeanors anywhere in this country, including Manhattan—if
> they were charged at all. If returned to Japan, Dr. Kanayama would face
> persecution as a Christian missionary, which he has been for many
> years, in a largely Buddhist and Shinto nation that has a history of
> persecuting those of Christian belief.

Petition at 2.

The petition is denied.

2

## BACKGROUND

### I.      Factual Background

The following factual recitation is taken from Judge Ramos's January 26, 2023,

Order certifying the extradition of Kanayama, as supplemented by other information in the

record in this case:

#### A.  Historical Background of the Narita Temple and Katori Shrine

The Temple and Shrine "bear significant historical, religious, and cultural value." (Order

at 1, attached hereto as GX-5). [1]   The Narita-san Shinsho-ji Temple is a Buddhist temple

founded in 940 AD. It contains a number of nationally designated cultural properties, attracting

approximately 10 million worshippers every year. (GX-3, Tab 1 at 257-258; GX-3, Tab 3 at

280). To enter the Temple's sanctuary, each worshipper must pass through the *So- mon* (Main

Gate)—which includes the three poles on which the vandalism occurred. (GX-3, Tab 3 at 279-

280). Accordingly, as explained in a signed statement by the General Affairs Section Chief of

the Narita Temple, the *So-mon* was built in a traditional Japanese architectural style, serves as

an important boundary for the sanctuary, and is itself an object of worship. (GX-3, Tab 3 at 279-

280). The *So-mon* took three years and eight months to construct, and was funded by the

donations of Temple followers at a cost about two billion yen (approximately $17.6 million).

(GX- 3, Tab 2 at 278; GX-3, Tab 3 at 280).

The Katori Jingu Shrine is one of the few historic shrines in Japan connected with the

---

[1] GX-1 through GX-4 constitute the record provided by the Government of Japan and submitted to Judge Ramos. GX-5 is Judge Ramos's January 26, 2023 Order certifying extradition and a transcript of the December 6, 2022 extradition hearing.

Imperial Family. (GX-3, Tab 4 at 284). It was founded during the reign of Japan's first Emperor in 643 BC. (GX-3, Tab 4 at 285). It contains a number of nationally designated cultural properties and attracts as many as two million worshippers a year. (GX-3, Tab 4 at 285).

The *Haiden*—the vandalized area of the Shrine—translates to Hall of Worship. (GX-3, Tab 4 at 284). It is where worship is offered to the deity and consists of two spaces for worshipping. (GX-3, Tab 4 at 285). According to the General Affairs Division Director of the Katori Shrine who is a *Shinto* priest, the *Haiden* is analogous to a sacred room of Christian churches where prayers are offered. In terms of structure, the *Haiden* of the Katori Shrine is a wooden one-story structure, and has stairs, poles, a roof and walls, such that worshippers can enter and exit an inside space. There is an offertory box located in the center of the stairs facing the front of the *Haiden*. The offertory box is used by worshippers to make donations to express appreciation for the deity's protection, and it was specially designed to fit the stairs as part of the *Haiden*. (GX-3, Tab 4 at 285-286).

### B. The Government of Japan's Investigation of Vandalism of the Temple and Shrine

In April 2015, Japanese police received separate complaints of damage from the Narita-san Shinsho-ji Temple in Narita, Japan, and the Katori Jingu Shrine in Katori Japan. In response to those complaints, Japanese police obtained video footage from the security cameras installed at both sites. (GX-2, Tab 5 at 51-52; GX-2, Tab 16 at 245-247 & 251-254 (containing still shots)). On March 25, 2015, at approximately 4:06 p.m., surveillance cameras installed at the Temple filmed a man suspiciously roaming the premises and touching three wooden poles on the east side of the *So-mon* (the "Main Gate"). (GX-2, Tab 5 at 52; GX-2, Tab 6 at 62). The man had black, thinning hair and wore the following: a gray jacket; a black, hooded, long-sleeved

4

windbreaker; a white, collared undershirt; dark blue jeans; and black shoes. (GX-2, Tab 5 at 52). Security footage did not show any other persons touching the wooden poles in this timeframe. (GX-2, Tab 5 at 52; GX-2, Tab 6 at 62). Photographs taken of the Main Gate by a tourist at approximately 2:24 p.m. showed the site free of oil stains; another taken by an employee of the Temple at 4:07 p.m. showed poles on the east side of the Main Gate defaced with an oily substance. (GX-2, Tab 6 at 62-64).

That same day—at 4:57 p.m., approximately 51 minutes later—surveillance cameras installed at the Shrine filmed a man dressed in the same clothes, with similar physical characteristics, touching the right and left wooden poles of the *Hoden* (the "Main Hall") and splashing liquid on an offertory box, the wooden stairs in front of it, and adjacent poles. (GX-2, at 26-27; & GX-2, Tab 5 at 52). Japanese officials reviewed the security footage from both locations and concluded that the same person appeared to have committed both acts of vandalism. (GX-2, Tab 5 at 52; *see also* GX-2, Tab 16 at 245-247 & 251-254).

After conducting simulation tests for three different routes from the Temple to the Shrine, which are located approximately 17 miles apart, the police investigators concluded that it was possible for the same person to commit the offenses at both locations during the 51-minute timeframe by driving a car on from the Temple to the Shrine via the Higashikanto Expressway (the "Highway"). (GX-2, Tab 5 at 53). Based on the characteristics of the suspect captured by the security cameras at the Temple and Shrine, investigators reviewed footage recorded by a security camera installed at the Sawara-Katori Tollgate-an expressway tollgate near the Shrine. (GX-2, Tab 5 at 53). The investigation revealed that a man resembling the suspect, including the clothing worn, who drove a gray Toyota Prius, paid the toll on March 25, 2015 at 4:41 p.m.,

approximately 35 minutes after the Temple was defaced, and 15 minutes before the Shrine was defaced. (GX-2, Tab 5 at 53). At that point, the investigators did not know the license plate number of the car. (GX-2, Tab 5 at 53).

The authorities thereafter obtained and examined 36 expressway tickets collected at the Sawara-Katori Tollgate around 4:41 p.m. (GX-2, Tab 5 at 53). Their review of the expressway ticket issued to the gray Prius revealed that the vehicle had a license plate number ending in "14" and that the driver first collected the ticket when passing through the Narita Tollgate-an expressway tollgate located near the Temple-at 4:30 p.m., approximately twenty minutes after the Temple was defaced. (GX-2, Tab 5 at 53). The officials then examined images captured by a security camera at the Narita Tollgate and identified a person resembling the suspect, including the clothing worn, driving a gray Prius through the gate at 4:30 p.m. (GX-2, Tab 5 at 53-54).

In furtherance of their investigation into the gray Prius, the investigators made inquiries with car rental companies in the vicinity of the Narita International Airport and ultimately identified a gray Prius with the license plate number "Narita300Wa414." (GX-2, Tab 5 at 54). Upon reviewing the records of the rental company, the police learned that an individual named Masahide Kanayama (*i.e.*, the Petitioner) rented the vehicle from 2:30 p.m. on March 25[3] to 9:30 a.m. on March 26, 2015. (GX-2, Tab 5 at 54). To obtain the rental car, the Petitioner provided the agency a copy of his Japanese passport. (GX-2, Tab 5 at 54-55). The investigators determined that the man in the passport photo resembled the suspect shown in the surveillance footage at the Temple and Shrine. (GX-2, Tab 5 at 55). To pay for the rental car, Petitioner used an American Express card. (GX-2, Tab 5 at 57). After contacting the credit card company and obtaining the billing records, the investigators further found that from March 21 to April 7,

6

2015, Petitioner made 24 purchases across seven Japanese prefectures, including the prefectures where the Temple and Shrine are located. (GX-2, Tab 5 at 57).

The Japanese officials thereafter contacted hotels located near the Shrine to see if the Petitioner stayed at one overnight on March 25, 2015. A register of the Spa & Resort Inubosaki Taiyonosato (the "Spa"), showed that the Petitioner checked into the hotel on March 25, 2015 at 6:47 p.m. (GX-2, Tab 5 at 57). Security cameras at the hotel also captured video of a man checking into the hotel at 6:47 p.m. who looked similar to the suspect recorded at the Temple and Shrine. (GX-2, Tab 5 at 57). The hotel's employees further confirmed that the Petitioner's car was a gray Toyota Prius. (GX-2, Tab 5 at 57).

The Japanese authorities, working with the Customer Service Department of the Narita International Airport, also procured the Petitioner's flight records for the relevant period. (GX-2, Tab 5 at 56). The records showed that the Petitioner departed John F. Kennedy International Airport in New York on March 20, 2015 and entered Japan via the Narita International Airport on March 21, 2015. (GX-2, Tab 5 at 56). On April 1, 2015, the Petitioner departed Japan through Narita Airport and arrived in Delhi, India that same day. (GX-2, Tab 5 at 56). He departed India on April 7, 2015, had a brief layover at the Narita Airport, and then returned to the United States. (GX-2, Tab 5 at 56).

The investigators retained Professor Masatsugu Hashimoto of Tokyo Dental College to perform a facial comparison between Kanayama's passport photo and the suspect's images taken by the security cameras at the Temple and Shrine. (GX-2, Tab 16 at 233-253). Examining, among other things, facial and morphologic features, Hashimoto concluded in an April 25, 2015 report that there was a "very high possibility" that the individual depicted in the footage obtained

7

from the Narita Temple and Katori Shrine and in Kanayama's passport were the same person. (GX-2, Tab 16 at 243). Hashimoto also observed that the colors of the suspect's jacket, shirt, pants, and shoes in the Narita Temple footage were identical to those captured in the video surveillance from the Katori Shrine. (GX-2, Tab 16 at 239).

Online investigation into Kanayama showed that he lived in New York, where he worked as a board-certified obstetrician-gynecologist, but that he was permanently domiciled in Tokyo, Japan. (GX-2, Tab 5 at 55-56). Kanayama regularly traveled from the United States to Japan and other countries, giving lectures and engaging in missionary activities through the Christian non-profit organization that he founded, the International Marketplace Ministry ("IMM"). (GX-2 at 28, GX-2, Tab 5 at 55-56). Two YouTube videos posted on IMMs website feature Kanayama presenting lectures on November 3 and December 31, 2012, wherein he admits to having "anointed" other Japanese shrines with oil for religious purposes. (GX-2, Tabs 17-18).

## C. Continued Damages and Repair Estimates

In response to Japan's extradition request, counsel for the Petitioner traveled to Japan, interviewed personnel at the Temple and Shrine, took photographs (among other things) and argued to Judge Ramos that the Temple and Shrine sustained no lasting damage.

In 2017, following Petitioner's submission of this information, the Government of Japan re-interviewed personnel at the Temple and Shrine and, at the request of the Japanese police, the Temple and Shrine obtained updated damage repair estimates from neutral third-party companies that specialize in the restoration of such structures. The updated third-party damages estimates accord with the estimates obtained in 2015, promptly following the defacement.

As to the Narita Temple, when the oily liquid was first discovered on the three east poles

8

of the *So-mon*, the poles looked wet with oil. (GX-3, Tab 3 at 279). As of October 18, 2017, the oil appeared to dry, having been absorbed in part by the unvarnished wood. The oily liquid has left black stains which are smaller than the original stains, but still visible on the poles. (GX-3, Tab 3 at 279).

As noted above, on or about October 6, 2017, at the request of the Japanese police, the Narita Temple obtained an updated estimate to repair the damages to the *So-mon* caused by the oily liquid. (GX-3, Tab 7 at 303). The estimate was performed by Kongo Gumi Co., Ltd, a company specializing in the construction of restoration of cultural properties, historic buildings, and fine arts and crafts. (GX-3, Tab 7 at 301). Notwithstanding that the stains caused by the oily liquid had decreased in size, Kongo Gumi Company estimated the repairs to be 120,500 JPY (*i.e.* approximately \$932, *see* GX-3, Tab 7 at 299-304), the same as originally assessed. (GX-3, Tab 7 at 299-304; *see also* GX-2, Tab 10 at 74). As the Kongo Gumi Company explained to the Japanese police, the repair estimate is the same because the same treatment plan applies—use of chemicals on the stains, which had absorbed into the wood. (GX-3, Tab 7 at 300-301). The other option—wholesale replacement of the poles—would be significantly more expensive and would detrimentally affect the appearance of the *So-mon*, as the poles would appear newer than the remainder of the gate. (GX-3, Tab 7 at 301). While it would be more affordable to wash the stains with chemicals, that treatment might be unsuccessful or even exacerbate the stains, because the exact nature of the oily substance is unknown. (GX-3, Tab 3 at 280; GX-3, Tab 7 at 301). In any event, undertaking any restoration activity would require the Narita Temple to close to worshippers and tourists for the duration of the work. (GX-3, Tab 3 at 281). In light of the costs involved, the Narita Temple had not begun restoration work. (GX-3, Tab 3 at 281).

9

With respect to the Katori Shrine, as of October 2017, the oil stains appear dry, and while faded, can still be seen at close range. (GX-3, Tab 4 at 286; GX-3, Tab 6 at 297; GX-3, Tab 8 at 307-308). On or about October 6, 2017, the Shrine obtained a second estimate of cost of restoration work from the Konishi Decorative Arts & Crafts Co., Ltd., a company specializing in the restoration of shrines and temples. (GX-3, Tab 8 at 305-310; *see also* GX-3, Tab 6 at 296-297). The estimate of restoration was the same as that originally obtained, that is, approximately 2,423,000 JPY (*i.e.* $18,747 U.S. currency. (GX-3, Tab 8 at 305-310; *see* GX-2, Tab 11 at 79-84). The Konishi Decorative Arts & Crafts Co explained that the repair work would necessitate the overcoating of lacquer over the damaged portions of the Shrine. (GX-3, Tab 8 at 307). This process would require removing the current lacquer, performing undercoating, and then applying a new coating of lacquer. (GX-3, Tab 8 at 307). Restoring only the damaged portions of the *Haiden* would result in a noticeable difference between those portions and the remaining portions, which could infringe on laws restricting changes to designated cultural properties. (GX-3, Tab 4 at 287). Visitors would need to be restricted during any restoration work, resulting in an additional loss of revenue beyond the funds necessary for repairs. (GX-3, Tab 4 at 287).

### A. Arrest Warrants & Japan's Request for Extradition

On April 28, 2015 and December 8, 2015, the Sakura Summary Court issued arrest warrants for Kanayama for two counts of damage of a structure in violation of Article 260 of the Japanese Penal Code, an offense punishable by more than one year in prison. The warrants have since been renewed on a yearly basis. (GX-2, at 26; *see also* GX-4 (Warrant Renewals)).

The Government of Japan formally requested the arrest, extradition, and surrender of the Petitioner through a diplomatic note dated December 12, 2016, addressed to the United States

Department of State (the "Extradition Request"). (*See* GX-1, Tab 1 (Declaration of Elizabeth M. M. O'Connor dated February 28, 2017).

## II.    **The Extradition Process**

Extradition is a means by which a fugitive such as Petitioner is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence of imprisonment. In the United States, extradition is primarily an executive function, with a limited role carved out for a judge pursuant to the federal extradition statute, 18 U.S.C. § 3184. That statute requires a judge to hold a hearing to consider whether the "evidence of criminality" presented by the foreign country is "sufficient to sustain the charge[s]" for which extradition is requested. *Id.* In fulfilling this function, the court should liberally construe the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See, e.g.*, *Valentine* v. *United States ex rel. Neidecker*, 299 U.S. 5, 104 (1936).

"What is at issue in the [extradition] proceeding . . . is not punishability but *prosecutability.*" *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (citation and quotation marks omitted) (emphasis in original). Thus, the judicial officer conducting the extradition hearing "performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense." *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996); *see also, e.g.*, *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) ("The evidence presented need only support a reasonable belief that [Petitioner] was guilty of the crimes charged.") (citation and internal quotation marks omitted). This analysis is exceedingly narrow; the judicial officer's role is "not

11

to determine whether the evidence is sufficient to justify a conviction," as that question is reserved for the foreign court. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Matter of Extradition of Ernst*, No. 97 Crim. Misc. 1, 1998 WL 395267, at *4 (S.D.N.Y. July 14, 1998).

The Federal Rules of Evidence do not apply to extradition proceedings. *See* Fed. R. Evid. 1101(d)(3); *Skaftouros*, 667 F.3d at 155 n.16. Thus, "[a] determination of probable cause in an extradition proceeding may rest entirely upon hearsay." *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y. 1973). And "[a] certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government." *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015); *see also, e.g.*, *Collins*, 259 U.S. at 317 ("unsworn statements of absent witnesses may be acted upon by the committing magistrate").

If the judicial officer finds the evidence sufficient to establish probable cause, he or she "shall certify the same" to the Secretary of State. 18 U.S.C. § 3184. "At that point, the Secretary of State has final authority to extradite the fugitive but is not required to do so." *Lo Duca*, 93 F.3d at 1103; *see also* 18 U.S.C. § 3186 ("Secretary of State *may* order the person . . . to be delivered to any authorized agent of such foreign government ") (emphasis added). "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990).

An extradition judge's certification order pursuant to Section 3184 is not subject to direct appeal; however, limited collateral review is available by way of a petition for a writ of habeas corpus. That petition is assigned at random to a judge in the district where the fugitive is held; which explains why I am "reviewing" the findings of my colleague of coordinate jurisdiction,

12

Judge Ramos— which is otherwise unthinkable.

## III.  Extradition Proceedings and Judge Ramos's Order Certifying Extradition

On May 30, 2017, following receipt of Japan's formal request for Petitioner's extradition, and in accordance with its extradition treaty obligations, the United States filed a complaint in this District and obtained a judicially-authorized warrant for Petitioner's arrest. (*See* Pet. Ex. 8). On June 2, 2017, U.S. law enforcement authorities arrested the Petitioner in Manhattan. He was presented in the Southern District of New York and released on bail with conditions. Judge Ramos presided over the extradition proceedings.

Petitioner had a full and fair opportunity to contest his extradition. Following the Government's motion, on October 20, 2017, he filed a 32-page opposition brief with numerous exhibits, totaling approximately 411 pages. (*See* Pet. Ex. 10 (w/o exs.)). On January 12, 2018, following a visit to Japan by Petitioner's counsel, Petitioner filed a sur-reply with additional exhibits totaling approximately 95 pages. (Pet. Ex. 12 (w/o exs.)). On December 6, 2022, Judge Ramos held an extradition hearing. (*See* GX-5).

On January 26, 2023, Judge Ramos issued the Order, certifying to the U.S. Secretary of State that Petitioner was extraditable. (*See* GX-5). The Order soundly rejects all of Petitioner's arguments, including all of the arguments he rehashes here. In particular, Judge Ramos observed that the dual criminality requirement was met, because the alleged conduct—Petitioner's application of oil to various portions of the Temple and Shrine, resulting in \$21,300 worth of damage—constituted a violation of Article 260 of the Japanese Penal Code, which penalizes "damage or destruction of structure (vandalism)," and is punishable by more than one year in prison, as well as a violation of New York Penal law § 145.05, which criminalizes intentionally

13

damaging the property of another person in an amount exceeding $250, and is also punishable by over a year in prison. (Order at 9-10). Judge Ramos also found probable cause established, based on surveillance imagery showing that a man resembling Petitioner touched or threw liquid towards the defaced areas of the Temple and Shrine; the documentary evidence placing the Petitioner in the vicinity of the Temple and Shrine during the respective times defacement occurred; evidence showing that the Petitioner checked into the Spa near the Shrine shortly after the Shrine was vandalized; the opinion of a Professor of Dentistry supporting the conclusion that the individual depicted in the footage is the Petitioner; the Petitioner's prior statements in which he discusses "anointing" Japanese shrines with oil in connection with his missionary work; and repair estimates from 2017 showing damages far exceeding $250. (Order at 11).

Judge Ramos's Order formally certified Petitioner's extradition for the Secretary of State's surrender decision. Petitioner filed the instant Petition on April 25, 2023.

## **Kanayama's Petition**

Kanayama asks the Court to grant his writ of habeas corpus on the ground that District Court Judge Ramos erroneously found that the Government had demonstrated "dual criminality" and that probable cause existed to support his extradition.

### *Standard of Review on Habeas*

"Habeas corpus, it is well known, is not a neutral proceeding in which the petitioner and the State stand on an equal footing." *Id.* at 158 (citation and quotation marks omitted). Rather, it is "an asymmetrical enterprise in which [Petitioner] seeks to overturn a presumptively valid judgment." *Id.* Accordingly, the burden is on Petitioner to show by a preponderance of the evidence that he is held contrary to the Constitution, law, or the treaties of the United States. *Id.*

14

"Habeas corpus is available to an extraditee 'only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" *Skaftouros*, 667 F.3d at 157 (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)) (emphasis added). In so doing, a court should review questions of law *de novo* and questions of fact for clear error. *Id.*

### *Judge Ramos's Order*

Petitioner does not contest that Judge Ramos had jurisdiction to conduct the extradition proceedings, but his petition does implicate the other two issues that fall within the narrow scope of habeas review of an extradition certification— whether the offenses for which his extradition is requested are encompassed by the Treaty and whether there is any evidence to support Judge Ramos's probable cause determination.

The Treaty encompasses offenses that are punishable under the laws of both Japan and the United States by imprisonment of more than one year. *See* Treaty, Art. II. This requirement, often referred to as dual criminality, "does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries." *Collins*, 259 U.S. at 312. Rather, "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Id.* In other words, courts must "look[] towards the *conduct* of the accused to see if it falls within the proscription of American criminal law." *Lo Duca*, 93 F.3d at 1112 (emphasis in original). In carrying out this inquiry, the presiding court should liberally construe the treaty. *See Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933).

15

The probable cause standard is the familiar one used in domestic cases. That is, "The evidence presented need only support a reasonable belief that [Petitioner] was guilty of the crimes charged." *Austin*, 5 F.3d at 605 (citation and quotation marks omitted). This, of course, is not, and should not be, an assessment of guilt. *See Collins*, 259 U.S. at 316 ("The function of the committing . . . [judge] is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

In determining probable cause, courts primarily rely on the extradition request, *Ahmad v. Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990), and further "*accept as true all of the statements and offers of proof by the demanding state*" *In re Extradition of Marzook,* 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (emphasis added); *see also Matter of Extradition of Atta,* 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989).

#### *Dual Criminality Is Met*

Kanayama is charged in Japan with two counts of damage or destruction of structure (vandalism), in violation of Article 260 of the Japanese Penal Code. (GX-2, at 24-26; GX-2, Tab 1 at 33-36; GX-2, Tab 2 at 37-39; GX-2, Tab 20). That crime is incorporated in the Treaty's Schedule, *see* Treaty, Schedule at 19 ("An offense relating to damage of property, documents, or facilities."), and a violation of Article 260 is punishable in Japan by imprisonment for more than one year (*see* GX-2, Tab 20). The alleged conduct underlying Japan's charges—that is, the intentional application of oil on various portions of the Temple and Shrine, resulting in over \$250 worth of damage (indeed, roughly \$20,000 in damages)—also qualifies as a felony offense in New York State, in particular, a violation of New York Penal Law § 145.05, which provides

16

that one is guilty of criminal mischief in the third degree if, with the intent to damage the property of another and having no right to do so nor any reasonable ground to believe that such a right exists, he "damages property of another person in an amount exceeding two hundred fifty dollars."

Based on the foregoing statutory analysis, and the evidence produced by Japan implicating Kanayama in the offense (*see supra,* 4-10), Judge Ramos concluded that the dual criminality requirement for extradition was satisfied. (*See* Order at 9-10).

Petitioner challenges Judge Ramos's conclusion on two grounds: (1) that Kanayama lacked the requisite intent to commit the crime; and (2) that neither the Temple nor the Shrine suffered actual "damage."[2]

Petitioner argues that the evidence Japan presented on his intent, that is, that he was religiously motivated to apply oil to the Temple and Shrine, does not qualify as specific intent to damage those sites within the meaning of New York Penal Law § 145.05, and thus he did not commit a crime within the meaning of New York State law.[3] (*See* Pet. Br. at point 38 & pp. 30). This argument fails for two reasons. First, contrary to Petitioner's assertion, a trier of fact could conclude that he intended to damage the Temple and Shrine even if his religious beliefs motivated him to inflict such damage, as motive and intent are distinct issues. *See, e.g.*, *People ex rel. Hegeman v. Corrigan*, 87 N.E. 792, 796 (N.Y. 1909) ("It is no defense to a charge of intentionally committing an act prohibited by law even that the dictates of his religious belief require one to do the act."); *People v. Assi*, 928 N.E.2d 388, 390 (N.Y. 2010) (affirming

---

[2] Petitioner made these same arguments to Judge Ramos.

[3] Petitioner does not challenge that such evidence would suffice to establish the requisite intent under Japanese law. (Pet. Br. at p. 31; *see also* GX-3, Tab 1 at 259-268; GX-3, Tab-2 at 269- 278).

conviction for, *inter alia*, criminal mischief in the third degree (as a hate crime) where evidence established defendant damaged synagogue because of his anger toward individuals of Jewish faith).[4]

Moreover, at least for purposes of this extradition hearing, Petitioner can be presumed to have intended to damage the properties based on his intentionally pouring oil on them, as Judge Ramos observed. (*See* Order at 10); *see also, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 167 (1878) ("A criminal intent is generally an element of crime, but every man is presumed to intend the necessary and legitimate consequences of what he knowingly does."); *People v. Addison*, 94 A.D.3d 1539, 1540, 943 N.Y.S.2d 359 (2012) ("A defendant may be presumed to intend the natural and probable consequences of his actions."); *People v. Reid*, 47 Misc.3d 1223(A), 16 N.Y.S.3d 793 (N.Y. Crim. Ct. 2015) ("Because intent cannot be the subject of a nonhearsay evidentiary allegation, it is necessary only that there be alleged evidentiary facts from which intent may be inferred."); *People v. Vinolas*, 667 N.Y.S.2d 198, 200 (N.Y. Crim. Ct. 1997) ("defendant's act of applying glue to the wall and covering the wall with advertisements tends to support the allegation that defendant intended to damage that wall" for purposes of the criminal mischief charge).

Furthermore, consistent with how issues of intent are ordinarily treated in criminal prosecutions, intent is an issue for the trier of fact in Japan in the context of a criminal trial— not

---

[4] *See also People v. Ivanov*, 23 Misc.3d 1129A, 886 N.Y.S.2d 68 (Sup. Ct., 2008) (denying motion to dismiss charge of criminal mischief and other charges where defendant claimed his acts of vandalism were "only attempting to draw attention to the lack of police presence in Brooklyn Heights."); *see also, e.g., United States v. Ahmad*, 98-1480, 1999 U.S. App. LEXIS 6113, at *4 (2d Cir. Mar. 31, 1999) ("since the innocent motive he proffers does not negate either his intent nor his knowledge, Ahmad has not met his burden of showing prejudice."); *United States v. Platte*, 401 F.3d 1176, 1181 (10th Cir. 2005) ("[t]he high-minded motives of Defendants do not negate their intent [I]f the law being violated is constitutional, the worthiness of one's motives cannot excuse the violation in the eyes of the law.")

for this Court to decide in connection with assessing probable cause. *See, e.g., United States v. Case*, 180 F.3d 464, 467 (2d Cir. 1999) ("intent is a question of fact"); *People v. Torres*, 708 N.Y.S.2d 578, 582 (N.Y. Crim. Ct. 2000) (denying motion to dismiss criminal mischief charge because, among other things, "intent to damage . . . is an issue for the trier of fact."); *Vinolas*, 667 N.Y.S.2d at 200 (N.Y. Crim. Ct. 1997) (merits of defendant's argument that he lacked the requisite intent should be decided at trial). Resolving the issue of Petitioner's intent would, in effect, require this Court to hold a trial. Yet the case law is clear and uniform that extradition proceedings are not the appropriate vehicle for resolving a fugitive's guilt or innocence. *See, e.g., Collins,* 259 U.S. at 314– 15; *Austin,* 5 F.3d at 603.

As for Kanayama's remaining argument that dual criminality is not satisfied because neither the Temple nor the Shrine suffered actual "damage," (*See* Petition point 39 & pp. 23, 28-29, 34-39), Judge Ramos correctly rejected it. (*See* Order at 10 n.3). Japan initially supported its extradition request with independent estimates from companies specializing in the repair, restoration and construction of cultural properties. Those companies concluded that that the damage to the Temple and Shrine far exceeded the thresholds for Petitioner to be convicted of criminal mischief in the third degree. In response to Petitioner's claims that any damage has disappeared "naturally," Japan sought and obtained updated independent cost estimates from the same companies that provided the initial cost estimates—these companies were selected by and contacted by the Temple and Shrine, and not Japanese law enforcement. As described *supra*, the updated cost estimates were the same as the initial estimates and well exceed the required thresholds. This remains true notwithstanding that the visible damage to the Temple and Shrine has lessened in the years since the crimes occurred. As set forth above, the restoration companies

19

explained that in certain cases the oily liquid has been absorbed by the damaged structures, making the process of restoration no different than originally anticipated. That the damages remain visible at close range was confirmed not only by staff, but by subsequent measurements taken by Japanese investigators. Japan's evidence, including the repair estimates obtained by the Temple and Shrine from the Japanese restoration companies and the investigators' observations and measurements is presumed authentic and truthful for purposes of this extradition proceeding, and more than sufficient to establish that "damage" occurred. *See, e.g. Ahmad,* 726 F. Supp. at 412 ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination."); *Matter of Extradition of Atta*, 706 F. Supp. at 1051 ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination.") (citing *Collins,* 259 U.S. at 315–16).

As conceded by Petitioner (*see* Pet. Br. at p. 34), New York law is clear that the independent damages estimates (such as those provided by Japan) can be used to meet the damage elements required for the Government to prove criminal mischief in the second or third degree, and that only "slight" damage must be proven under New York Law. (*See* Pet. Br. at p. 34); *see, e.g.*, *People v. Fancher*, 116 A.D.3d 1084, 1088, 984 N.Y.S.2d 174 (App. Div. 2014) ("[A]n auto body shop owner's estimate of the cost of repairing a vandalized pickup truck provided legally sufficient evidence that the damage exceeded $250, even though the repairs were never performed."); *People v. Garcia*, 29 A.D.3d 255, 263, 812 N.Y.S.2d 66 (App. Div. 2006) ("In a criminal mischief case, the amount of damage is generally measured by the

20

reasonable cost of repairing the damaged property, provided it can be repaired . . . The repair cost may be established by expert testimony."); *People v. Smeraldo*, 242 A.D.2d 886, 886, 662 N.Y.S.2d 883 (App. Div. 1997) (affirming conviction of criminal mischief in second degree here "[c]omplainant testified that she observed defendant spraying a liquid on her car, and the operator of a collision shop testified that, in his expert opinion, the cost of repairing the vehicle would be $1,963.93.").

While Petitioner also emphasizes that neither the Temple nor the Shrine has actually undertaken repairs or sustained a loss of function or financial loss (*see* Pet. Br. at p. 35), this is not an element of the statute nor a requirement otherwise imposed by caselaw. The lack of actual repair does not render the asserted damage unquantifiable. *See, e.g.*, *Fancher*, 116 A.D.3d at 1088 ("[A]n auto body shop owner's estimate of the cost of repairing a vandalized pickup truck provided legally sufficient evidence that the damage exceeded $250, even though the repairs were never performed."). Similarly absent from the statute is any requirement that the Temple and Shrine suffer a "loss of use" as a result of the damage, as asserted by Petitioner. That too constitutes an effort to impose an element onto the statutes that simply isn't there.

Relatedly, Petitioner claims that the Temple and Shrine directors determined that no repairs were necessary prior to police intervention. (Pet. Br. at pp. 23, 28, 29). This is both wrong and, in any event, irrelevant. According to the General Affairs Section Chief and Property Administration Section Chief of the Temple, who were interviewed by Japanese police and whose statement appears in the record:

Back then, the damages done to our properties remind us of the vandalism cases reported in the media, and we strongly suspect that we also fell victim to the same crime. When we were trying to get the full extent of damages and discuss whether to report the incident to the police, Narita police station warned us to

21

look out for similar instances as those reported in the media. This is how we decided to file the report. (GX-3, Tab 5 at 292).

Similarly, according to a priest interviewed at the Shrine:

I never said such a thing as we did not feel the need to contact the police about the oil sprinkling. The police came because we reported it. And so it is natural that we explained the damages to the police. It is also natural that we filed the victim's report afterwards. We would have never contacted the police without intending to file a victim's report." (GX-3, Tab 6 at 296).

As part of his reply to the Government's opposition papers, Kanayama retained the services of an expert in the field of chemistry and woodwork: Dr. James V. DeFrancesco, the Director of the Interdisciplinary Forensic Science Program in the Department of Chemistry and Biochemistry at Loyola University Chicago. Dr. DeFrancesco was asked to determine what the effect of applying vegetable-based oil to the finished and unfinished wood surfaces at Katori and Narita would be. Petitioner says that it had Dr. DeFrancesco reviewed the numerous documents, photographs, and other materials presented by the petitioner and the respondent over the course of these proceedings, including those before the district court. The expert concluded that "In sum, the documentation provided by the Japanese government does not contain any credible scientific evidence of long-term damage [to the objects at the temple or the shrine]." Petitioner's Reply, Exhibit.4.

While Petitioner makes an interesting counter argument challenging the Japanese Government's damage allegations, his evidence merely raises doubts about the reliability of the Government's proof, which is insufficient to defeat an extradition request. *See United States v, Pena-Bencosme*, 2006 U.S. Dist. LEXIS 82579, \*35 (E.D.N.Y. Oct. 30, 2007). Judge Ramos's mandate was to determine whether there was competent evidence to justify holding Kanayama

over for trial— "not to determine whether the evidence is sufficient to justify a conviction." *See Collins*, 259 U.S. at 316. And it most certainly is not the role of the habeas court to re-litigate Judge Ramos's reasoned determination under the even more narrow standard applicable to habeas review. *See Skaftouros*, 667 F.3d at 157 (*quoting Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("Habeas corpus is available to an extraditee 'only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty.'") (Emphasis added).

At bottom, the question of whether Japan has proven that the properties were damaged to a particular monetary threshold is a factual question that should be decided by the trier of fact in Japan. *See, e.g. People v. Torres*, 708 N.Y.S.2d 578, 582 (N.Y. Crim. Ct. 2000) ("While the defendants assert that the glue was "water soluble," the intent to damage and the question of actual damage is an issue for the trier of fact. At this stage of the proceedings, the accusatory instrument provides 'reasonable cause' . . . to believe that the scaffolding at issue was 'damaged' by virtue of the application of glue, a foreign substance, and paper."); *Vinolas*, 667 N.Y.S.2d at 200 n.1 ("It is reasonable to assume that the restoration of the property to its original state, no matter how slight the damage, will have a cost in effort and/or money.").

Accordingly, the Government has sufficiently demonstrated that Petitioner's conduct caused damage that violated both the Japanese Penal Code Article 260 and the New York Penal Law criminal mischief statute— crimes that carry a sentence of more than one year.

23

### *Judge Ramos Correctly Determined That There was Probable Cause*

Listing the voluminous evidence provided by the Government of Japan, Judge Ramos concluded that "the evidence set forth by the Government that Kanayama has committed the charged offenses is substantial." (Order at 10). That evidence included airplane, car rental, toll booth, and hotel records establishing that Petitioner was in the vicinity of the Temple and Shrine on the date and times the properties were vandalized. Petitioner does not dispute that he was the person who rented the gray Toyota Prius that traveled between the two sites via the Highway that day, and does not dispute that he drove on the Highway that day from the Narita Airport to the Spa, where he stayed (*see* Pet. Br. at p. 52; GX-5 (Hr'g Tr. dated Dec. 6, 2022, at 34-35); GX-2, Tab 5 at 53-55). The evidence also included (1) surveillance footage capturing the car admittedly rented by Petitioner entering and leaving the parking lot of the Narita Temple on the date and within the timeframe the property was vandalized (GX-2, Tab 5); (2) surveillance footage capturing an individual resembling Petitioner, including the clothing worn, touching and/or gesturing towards the affected structures in the Temple and Shrine around the respective times the vandalism occurred (GX-2, Tab 16 at 231-253); (3) security footage at the Spa capturing a man checking into the hotel at 6:47 p.m. who looked similar to the suspect recorded at the Temple and Shrine (GX-2, Tab 5 at 57); (4) a timeline of Petitioner's travel on March 25, 2015, from the Narita Airport to the Spa, and a comparison of that time with the expected travel time, as determined by internet searching (GX-3, Tab 9 at 311-313); (5) YouTube videos of lectures by Petitioner, preceding the events underlying the extradition request, during which he states that he applied oil onto various shrines for religious purposes (GX-2, Tabs 17-18); and (6) an expert identification report concluding there is an "extremely high possibility" that the

individual depicted in the above- described surveillance and Petitioner's passport are the same person (GX-2, Tab 16 at 243). *See generally*, Factual Background, *supra*.

Against the weight of this rather extraordinary amount of evidence, Petitioner's explanations—even if it were proper to consider them—*see In re Extradition of Marzook*, 924 F. Supp. at 592 (accepting as true all of the statements and offers of proof by the demanding state)—do not hold up.

Petitioner contends that he rented the car from the Narita Airport and drove it to the Spa but did not stop at the Temple or Shrine. (Pet. Br. at pp.52- 53). However, as the record reflects, while that trip should have taken him slightly over an hour, it took Petitioner approximately four. (GX-3; Tab 9 at 312-313).

Petitioner also contends that there were inaccuracies in Japan's translation of his lectures that appear on YouTube videos. Specifically, Petitioner seeks to draw a distinction between the terms "anoint" and "pour." (Pet. Br. at pp. 48-52). But, Petitioner's disputes about the translation of certain words in his lectures fall outside the scope of these proceedings. *See, e.g.*, *Tang Yee-Chun v. Immundi*, 686 F.Supp. 1004, 1009 (S.D.N.Y.1987) ("There is nothing in the Treaty or the applicable statute requiring the Court to undertake an independent inquiry into the accuracy of any translations submitted with a formal request for extradition. Such a requirement would place an unbearable burden upon extradition courts and seriously impair the extradition process."); *Ntakirutimana v. Reno,* 184 F.3d 419, 430 (5th Cir. 1999) ("We agree with the district court that we can presume that the translations are correct."). In any event, the distinction Petitioner seeks to draw between the term "anoint" and "pour" is a red herring, as both interpretations countenance the intentional application of oil to Japanese shrines, which is the

25

criminal conduct charged here. *See, e.g.*, *Marzook v. Christopher*, No. 96 Civ. 4107 (KMW), 1996 WL 583378, at \*5 n.8 (S.D.N.Y. Oct. 10, 1996) ("Dr. Abu Marzook has questioned the accuracy of the translation of the press interviews provided by the Israeli government. However, even if his corrections are accepted, they do not alter the gist of the interviews.").

Petitioner contends that that the identification analysis report submitted by Japan is worthless yet critical to Judge Ramos's ruling, and further claims that his rebuttal expert report, "obliterated" the probable cause determination. (Pet. Br. at point 50 & pp. 45-47). Petitioner is wrong on all points. First, far from being a significant factor in Judge Ramos's probable cause determination, Judge Ramos correctly ruled that "even assuming that Kanayama raises some doubt as to the conclusions . . .[of Japan's expert report], the evidence proffered by the Government, taken in its entirety, nonetheless permits a person of ordinary prudence to entertain a reasonable belief that Kanayama is guilty of the charged offenses." (Order at 11). In other words, even casting aside Japan's expert report, the record nonetheless established probable cause that it was Petitioner who damaged the Temple and Shrine.

Moreover, Judge Ramos was correct to preclude Petitioner from introducing his own expert testimony to rebut the testimony offered by Japan via its expert report. (Order at 11). Such expert material plainly constitutes inadmissible contradictory evidence and should not be considered. The Second Circuit case *Kapoor v. Dunne*, No. 14–1699–pr, 606 Fed. Appx. 11, at \*13 (2d Cir. June 2, 2015) (Summary Order), is directly on point:

Kapoor argues that this [handwriting] report is 'explanatory evidence' that demonstrates that the signature that appears on documents she allegedly forged is not, in fact, hers. In its extradition materials, however, India offered a contradictory report from a bank official, V.K. Mohan Das, in which he asserts— based on bank records—that the signature that appears on allegedly forged documents he reviewed is Kapoor's. Kapoor challenges Mohan Das's

26

qualifications to make this assessment. This is precisely the type of credibility
contest that the rule against contradictory evidence is intended to avoid.

*See also, e.g.*, *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) ("The judge's refusal to

examine the credibility of the testimony and statements included in the translated material was

clearly proper, since the declarants were not before him."); *Matter of Extradition of Glantz*, 94

Crim.Misc. 1 P. 25, 1995 WL 495644, at \*13 (S.D.N.Y. Aug. 21, 1995) ("In an extradition

proceeding the [fugitive] may not proffer evidence to contradict the showing of the requesting

state. He is thus limited to attempting to offer a benign explanation of the evidence presented

against him.").[5]

Accordingly, there is no basis for this Court to disturb Judge Ramos's determination that

there was far more than just "any" evidence to believe that Kanayama committed the charged

crime, but that there was substantial evidence establishing probable cause.

### *Humanitarian and Other Considerations*

Finally, Petitioner contends that if extradited, he will be persecuted in Japan because of

his Christian missionary activities and his mixed ethnicity (Japanese and Korean), and that there

is no chance a Japanese court will exonerate him given that the conviction rate in Japan is over

99%. (*See* Pet. Br. at point 5 & pp. 18, 19). However, the Supreme Court, the Second Circuit,

and myriad other courts around the country have uniformly and repeatedly held that such

humanitarian claims are reserved exclusively for the Secretary of State's consideration and are

---

[5] Moreover, Petitioner's contention that the expert identification analysis submitted by Japan would fail a *Daubert*
inquiry misses the mark because evidence supporting probable cause is "not subject to the standards for
admissibility of expert testimony under [*Daubert*]." *Harmon v. Marshal*, 391 Fed. Appx. 632 (9th Cir. 2010); *see
also, e.g., United States v. Sassani*, 139 F.3d 895 (4th Cir. 1998) ("The defendant does not present the court with
support for his assertion that the profile [used to establish probable cause] was required to meet the standards of
[*Daubert*], nor can this court find any such requirement."). In any event, that the man captured in the still images of
the properties' surveillance footage appears similar to the images of Petitioner as reflected in his passport is evident
even from a layperson perspective.

not judicially reviewable in habeas challenges to extradition.

In *Munaf*, the Supreme Court rejected an attempt by U.S. citizens to enjoin their transfer to Iraqi custody on the grounds that the transfer would likely result in their being tortured. 553 U.S. at 700. The Court held that allegations of torture "are of course a matter of serious concern, but in the present context that concern is to be addressed by the political branches, not the Judiciary." *Id.* The Court reasoned that "the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is." *Id.* at 702. The Court further noted that "The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." *Id.*

In *Ahmad*, the Second Circuit held that the district court erred in considering petitioner's claims about the requesting country's treatment of its prisoners. 910 F.2d at 1067. *Ahmad* is consistent with the Second Circuit's prior holding in *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980), where the court held that "the degree of risk to [the petitioner's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch." *Id.* at 174. Myriad other courts have reached the same conclusion. *See, e.g.*, *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006) (refusing to consider Petitioner's humanitarian arguments against his extradition to Albania notwithstanding State Department reports citing instances of police brutality and poor prison conditions in that country); *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980); *Gill v. Imundi*, 747 F. Supp. 1028, 1049-50 (S.D.N.Y. 1990); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 227-228 (N.D.N.Y. 2013).

Judge Ramos was correct, Kanayama's humanitarian arguments are properly directed to the Secretary of State—they are not a basis for a court to deny extradition. (*See* Order at 12 n.8).

Similarly, Kanayama argues that it simply unfair that he be returned to Japan to face such dire circumstances when his alleged crime would never be prosecuted as a felony in New York County.

Kanayama engaged a former supervising prosecutor in the New York County District Attorney's Office to address this question "from an experiential and empirical perspective." That former prosecutor, A.J. Bosco, spent 11 years as an Assistant District Attorney in that office, including two years as Deputy Bureau Chief in the Trial Division. Mr. Bosco reports that, in his personal experience, no criminal mischief case similar to the instant one was ever prosecuted as a felony. Petitioner's Reply, Ex. 5. Bosco says that he reviewed 111 NYPL §145.05 cases available online through the New York State Law Reporting Bureau. His review revealed that none of those cases involved facts even remotely similar to the present one. In actuality, the allegations in those matters fell almost entirely into three categories: 73.9% of the defendants were charged with §145.05 secondary to another felony – typically burglary, petit or grand larceny, arson, DUI, or assault—23.4% of them were charged with §145.05 ancillary to a dispute between two parties in which the defendant intentionally damaged the property of the other individual; and 1.8% of the defendants were accused of violating §145.05 in matters involving the spray painting of massive graffiti on large or multiple surface areas. *Id.*

Bosco also opines that that the specific intent required by NYPL 145.05 is not necessarily mandated by the applicable Japanese law. Bosco concludes by stating that: "it is highly unlikely that the conduct charged against Dr. Kanayama in Japan would have been charged as a crime in

New York County...At most, a misdemeanor charge of Criminal Mischief in the Fourth Degree under N.Y.P.L § 145.00, carrying a maximum penalty of one year in jail, would have been brought. I cannot think of any circumstance under which these facts would have been charged as a felony." *Id*.

But Bosco's testimony accepts as true Kanayama's version of facts (that Kanayama did not intend to cause damage, and there was no permanent damage to the religious sites), and rejects the ample evidence produced by the Japanese Government that defendant did intend the consequences of his actions (damage to the sites) and that the damage was in excess of $250. Petitioner is essentially asking the Court to ignore the limited role assigned to the courts in the extradition process—to determine ""whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" *Skaftouros*, 667 F.3d at 157 (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)) (*emphasis added*). Moreover, the relevant issue is whether a crime carrying a sentence of more than one year **could** be prosecuted; not whether it **would** be prosecuted.

Petitioner may present his arguments to the Secretary of State, who may consider humanitarian claims in deciding whether to ultimately deny Japan's extradition request, grant the request, or grant the request with conditions.

### *Conclusion*

Kanayama's petition is denied.

To the extent that Kanayama has a right to appeal this Court's denial of his petition, the Court declines to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see United States v. Perez*, 129 F.3d

255, 260 (2d Cir. 1997).   Further, the Court finds, pursuant to 28 U.S.C. § 1915(a)(3) that any

appeal from an order denying Kanayama's motion would not be taken in good faith. *See Feliz v.*

*United States*, No. 01-cv-5544, 2002 WL 1964347, at *7 (S.D.N.Y. Aug. 22, 2002).

    This constitutes the decision and order of the Court.

April 11, 2024

Colleen McMahon,
U.S.D.J.